# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

WILLIAM BARKETT, MONTEREY
FINANCIAL ADVISORS LLC; WASCO
INVESTMENTS LLC;

Plaintiffs,

v.

SENTOSA PROPERTIES LLC; AND
ARNOLD HUANG,

Defendants.

Case No. 1:14-CV-01698-LJO-JLT

CORRECTED[1] MEMORANDUM
DECISION AND ORDER GRANTING
DEFENDANTS' MOTION TO EXPUNGE
LIS PENDENS

(Doc. 71)

Before the Court in the above-styled and numbered cause of action is Defendants Sentosa
Property LLC and Arnold Huang's ("Defendants") Motion to Expunge Lis Pendens, filed July 14,
2015 (Doc. 71). Plaintiffs filed their Opposition on August 3, 2015 (Doc. 72), and Defendants filed a
Reply on August 10, 2015 (Doc. 76). The Court finds the motion appropriate for resolution without
oral argument. Fed.R.Civ.P. 78; Local Rule 230(g). Having considered the parties' briefing, the
record in the case, and the relevant law, the Court will grant Defendants' motion for the reasons set
forth below.

## I.   BACKGROUND

Plaintiffs William Barkett ("Barkett"), Monterey Financial Advisors LLC, Parker Dam
Development, Wasco Investments LLC ("Wasco Investments"), and Barusa LLC (collectively,
"Plaintiffs") commenced this action on August 20, 2014, by filing a Complaint in the California
Superior Court for the County of Kern against Defendants Sentosa Properties LLC ("Sentosa"), WF
Capital, Inc. ("WF Capital"), Eugene Wong, and Arnold and Elizabeth Huang (collectively

---

[1] This Memorandum Decision and Order amends and supersedes the Order issued September 28, 2015, Doc. 79, in order
to add certain details, including document numbers and property descriptions, to facilitate expungement of the lis
pendens and related documents.

"Defendants"). *See* Compl., Doc. 1. Defendants removed to this Court asserting diversity jurisdiction. *See* 28 U.S.C. §§ 1332(a), 1441(b).

The action arose out of various loans by WF Capital to Wasco in order to purchase and develop real property ("the Property") near the City of Wasco. *See generally* Compl., Doc. 1. The Property at issue in Kern County, as described in the Complaint, consists of six parcels: (1) Parcel One: APN No. 487-010-69; (2) Parcel Two (an easement recorded November 2, 2009 as Doc. No. 0209162732); (3) Parcel Three: APN No. 487-290-18; (4) Parcel Four: APN Nos. 487-290-05 and 06; (5) Parcel Five: APN Nos. 487-290-14, 15, and 16; (6) Parcel Six: APN No. 487-290-18. *See* Compl., Doc. 1-4 at 23-26, Ex. 1; *see also* Doc. 71-3 at 64-66, Ex. 1 to Ex. B (property description).

The thrust of all of Plaintiffs' claims is that Defendants' actions, specifically proceeding with foreclosure proceedings against the Property after allegedly entering a binding forbearance agreement, constitute breach of contract and fraud.

After the Court in its February 2015 Order (Doc. 52) granted Defendants' motion to dismiss the Complaint with leave to amend, Plaintiffs filed a First Amended Complaint (Doc. 55, "FAC"). Defendants moved to dismiss the FAC (Doc. 59). In an Order rendered June 16, 2015, the Court granted Defendants' motion and dismissed with prejudice all of Plaintiffs' claims. *See* Doc. 67.

On June 22, 2015, Plaintiffs filed a notice of appeal to the United States Court of Appeals for the Ninth Circuit. *See* Docs. 69 & 70.

On January 23, 2014, Defendants moved to expunge the notice of lis pendens, recorded in Kern County on December 11, 2014 (as Document No. 0214153536), and a memorandum of agreement that Plaintiff recorded in Kern County on June 13, 2014 (as Document No. 0214067557), both against the subject Property. *See* Doc. 71-3 at 9-58, Ex. A (memorandum agreement); *id.* at 60-62, Ex. B (notice of lis pendens); *see also* Doc. 74. Plaintiffs opposed the motion on August 3, 2015, and Defendants filed a Reply on August 10, 2015. The matter is ripe for review.

## II.   DISCUSSION

### A.  Motion to Expunge Lis Pendens

Federal courts look to state law when deciding matters involving lis pendens. *See* 28 U.S.C. § 1964. Under California Code of Civil Procedure § 405.20, "[a] party to an action who asserts a real

property claim may record a notice of pendency of action, [a lis pendens], in which that real property claim is alleged." The effect of a lis pendens "is that anyone acquiring an interest in the property after the action was filed will be bound by the judgment." *BGJ Assocs., LLC v. Superior Court,* 75 Cal. App. 4th 952, 966 (1999). Once filed, "it clouds the title and effectively prevents the property's transfer until the litigation is resolved or the lis pendens is expunged." *Id.* at 967.

Under California law, parties at any time in the pendency of the litigation may ask the court in which the action is pending to expunge the notice of lis pendens. Cal.Code Civ. Proc. § 405.30. A court shall order that the notice be expunged if (1) "the court finds that the pleading on which the notice is based does not contain a real property claim"; or (2) "the court finds that the claimant has not established by a preponderance of the evidence the probable validity of the real property claim." *Id.* §§ 405.31-2. "Probable validity" of a claim means that it is more likely than not that a plaintiff will obtain a judgment against the defendant. *Orange County v. Hongkong and Shanghai Banking Corp. Ltd.,* 52 F.3d 821, 824 (9th Cir. 1995) (citing Cal.Code Civ. Proc. § 405.3). It is a plaintiff's burden to establish probable validity. Cal.Code Civ. Proc. § 405.32.

Defendants argue that the Court should grant their request to expunge the notice of lis pendens for four reasons: (1) Plaintiffs failed to comply with the statutory rules governing service, notice, and filing the lis pendens; (2) Plaintiffs in the FAC never asserted a real property claim; (3) this Court has dismissed with prejudice Plaintiffs' action in its entirety; and (4) Plaintiffs' appeal does not demonstrate a likelihood of success on the merits.

Plaintiff argues that the lis pendens should not be expunged because the controversy about the real property remains unresolved in light of their appeal of this Court's final decision to the Ninth Circuit Court of Appeals. Plaintiffs contend that this Court should maintain the status quo leaving the lis pendens in place until the Ninth Circuit appeal resolves the case. Plaintiffs do not challenge that California law governs.

First, this Court has previously determined that Plaintiffs in their FAC did not state claims upon which relief could be granted. *See* Docs. 52, 67. Therefore, Plaintiffs have not shown by a preponderance of the evidence that any claims are "probably viable" for the purposes of the instant motion. *See* Cal.Code Civ. P. § 405.32 ("In proceedings under this chapter, the court shall order that

3

the notice be expunged if the court finds that the claimant has not established by a preponderance of the evidence the probable validity of the real property claim. The court shall not order an undertaking to be given as a condition of expunging the notice if the court finds the claimant has not established the probable validity of the real property claim."); *see also Howard S. Wright Constr. Co. v. Superior Court,* 106 Cal.App.4th 314, 319 (2003) ("A notice of lis pendens may be expunged if the trial court finds that the plaintiff-claimant 'has not established by a preponderance of the evidence the probable validity of the real property claim.'").

The Court understands that Plaintiffs disagree with this Court's dismissal of their claims. However, Plaintiffs' argument for the status quo rehashes the same arguments previously presented to the Court in the briefing relative to the motions to dismiss, which the Court found unavailing. California law provides that "on a motion to expunge a lis pendens after judgment against the claimant and while an appeal is pending, the trial court must grant the motion unless it finds it more likely than not that the appellate court will reverse the judgment." *Amalgamated Bank v. Superior Court,* 149 Cal.App.4th 1003, 1015 (2007); *see also Masson v. Selene Fin. LP,* 2013 WL 4427116 (N.D. Cal. Aug. 15, 2013) (citing *Amalgamated Bank); Mix v. Superior Court,* 124 Cal.App.4th 987, 997 n. 8 (2004) (explaining that "it would completely circumvent the Legislature's intent in enacting section 405.32, [if] merely filing an appeal, no matter how meritless, would automatically keep the lis pendens in place").

For the same reasons detailed in its February and June 2015 Orders, *see* Docs. 52 and 67, the Court finds that it is not "more likely than not that the appellate court will reverse the judgment." *Amalgamated Bank,* 149 Cal.App.4th at 1015. Accordingly, the Court concludes that it must grant the motion to expunge. *Id.*

### B. Attorneys' Fees

Defendants also move for attorneys' fees related to the instant motion. California Code of Civil Procedure section 405.38 authorizes an award of attorney's fees to a prevailing party on a motion to expunge a lis pendens, providing:

> The court shall direct that the party prevailing on [a motion to expunge lis pendens] be awarded reasonable attorneys' fees and costs of making or opposing the motion unless the

4

court finds that the other party acted with substantial justification or that other circumstances make the imposition of attorneys' fees and costs unjust.

Defendants in their declarations state that before filing the instant motion they contacted Plaintiffs and requested that they voluntarily withdraw the lis pendens in light of this Court's dismissal of all of Plaintiffs' claims. *See* Doc. 72-2, Sharron Decl. ¶¶ 4, 5. The record shows that Plaintiffs initially declined to withdraw the notice of pending action. *See* Doc. 75, Gilmore Decl. ¶¶ 5, 6. In response, Defendants filed the instant motion, and, in opposition, Plaintiffs filed Barkett's declaration indicating that Plaintiffs would not acquiesce. *See* Doc. 72. With guidance by counsel, Plaintiffs ultimately reconsidered and made efforts to voluntarily withdraw the notice. *See* Gilmore Decl. ¶ 8-11; *see also* Docs. 73, 74. Even so, Kern County did not accept the voluntary withdrawal, seeking instead an order from this Court. *See* Sharron Decl. ¶ 6.

Plaintiffs do not challenge that an award of attorneys' fees to Defendants relative to the instant motion would be unjust. *See* Cal.Code Civ. Proc § 405.38. Rather, Plaintiffs object to Defendants' counsel's estimate that she spent 15 hours preparing the instant motion and her requested hourly rate of $450. Defendants' counsel filed a declaration in which she and an associate spent a combined 16.5 hours preparing the motion, and estimated that they would spend another 11.5 hours reviewing the opposition and drafting a reply, at an hourly rate of $450 per hour.

The Court determines a reasonable fee award using the lodestar method, which calculates a reasonable award by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate. *Gonzalez v. City of Maywood,* 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 978 (9th Cir. 2008). "In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Ingram v. Oroudjian,* 647 F.3d 925, 928 (9th Cir. 2011) (internal quotations and citation omitted) (per curiam). "Generally, when determining a reasonably hourly rate, the relevant community is the forum in which the district court sits." *Camacho,* 523 F.3d at 979.  The movant carries the burden of providing sufficient evidence that the requested rate meets the community standard. *See Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984); *accord Van Skike v. Director, Office of Workers' Compensation Programs,* 557 F.3d 1041, 1046 (9th Cir. 2009). Courts should exclude from its initial

calculation hours that are "excessive, redundant, or otherwise unnecessary." *Gonzalez,* 729 F.3d at 1203; *McCown v. City of Fontana,* 565 F.3d 1097, 1102 (9th Cir. 2008).

1.   Hourly Rate

Here, Defense counsel represents that $450 is her usual hourly rate, substantially discounted. However, her actual rate charged is not evidence of the prevailing market rate. *See Schwarz v. Sec'y of Health & Human Servs.,* 73 F.3d 895, 898 (9th Cir. 1995). The Court is guided not by counsel's suggestion, but by the prevailing market rate within the Eastern District of California, Fresno Division, where the action was adjudicated. *Camacho*, 523 F.3d at 979.

Because Defendants fail to carry their burden to show that the rate requested is in line with prevailing rates in the Fresno Division, for guidance the Court looks to decisions from courts within the forum district awarding fees on similar matters. *See, e.g., Nadarajah v. Holder,* 569 F.3d 906, 917 (9th Cir. 2009) (finding that courts may rely on decisions by other courts awarding similar rates for work in the same geographical area by attorneys with comparable levels of experience).

The Court finds Defendants' request for a $450 hourly rate exceeds the prevailing market rate in the Fresno legal community. Courts within the Eastern District of California's Fresno division have found that a reasonable range of attorney's fees is "between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience." *Silvester v. Harris,* No. 1:11-CV-2137 AWI SAB, 2014 WL 7239371, at *4 (E.D. Cal. Dec. 17, 2014) (collecting cases) ($375 hourly rate for attorneys with 18 and 20 years of experience; $350 for attorney with 11 years of experience, $285 for attorney with ten years of experience); *see, e.g., Willis v. City of Fresno,* No. 1:09-CV-01766–BAM, 2014 WL 3563310, at *12-14 (E.D. Cal. Jul. 17, 2014) ($300 hourly rate appropriate for attorney with 19 years of experience); *Miller v. Schmitz,* No. 1:12-CV-00137-LJO-SAB, 2014 WL 642729 at *3 (E.D. Cal. Feb. 18, 2014) ($350 hourly rate appropriate for attorney with 20 years of experience); *Estate of Crawley v. Kings Cnty.,* No. 1:13-CV-02042-LJO, 2015 WL 4508642, at *7 (E.D. Cal. July 24, 2015) ($330 hourly rate appropriate for attorney with approximately 15 years of experience). For practitioners with less than ten years of experience courts have found that a reasonable range for attorneys' fees is "between $175 and $300 per hour." *Id.* (collecting cases).

The Court concludes that a current reasonable range of attorneys' fees, depending on the attorney's experience and expertise, is between $250 and $400 per hour, and that $300 is the upper range for competent attorneys with approximately a decade of experience. *See Silvester,* 2014 WL 7239371, at *4. Given defense counsel's eight years of experience and the nature of the motion to expunge, the Court finds that $285 is a reasonable hourly rate to use for the lodestar calculation. *Id.*

2.   Hours Worked

Plaintiffs also object to Defendants' hours expended to prepare and file the instant motion. Movants need only provide a minimal level of detail that identifies the general subject matter of the time expenditures. *See, e.g., Lytle v. Carl,* 382 F.3d 978, 989 (9th Cir. 2004); *Trustees of Directors Guild of Am.-Producer Pension Benefits Plans v. Tise,* 234 F.3d 415, 427 (9th Cir.) *opinion amended on denial of reh'g,* 255 F.3d 661 (9th Cir. 2000). Here, however, Defendants ask for reimbursement for time they estimate they *may* spend, but provide no billing detail other than total hours worked (16.5 on the motion collectively between two attorneys), and the general description of the tasks. While basic billing records are generally sufficient, Defendants' prediction does not meet this low bar. *See id.* Therefore, the Court will reduce the total number of hours requested, 28, by the forecasted 11.5 hours.

In any event, the Court finds that even 16.5 hours is excessive. In a nearly identical case related to attorneys' fees on a motion to expunge a lis pendens, *Morgan v. Aurora Loan Servs., LLC*, No. 2:12-CV-04350-CAS, 2014 WL 772763, at *2 (C.D. Cal. Feb. 20, 2014), a defendant stated that they contacted the plaintiff requesting that she withdraw the notice. But plaintiff did not, and the court ultimately granted defendant's motion to expunge. Having prevailed, defendants testified by declaration that they spent 5.5 hours related to the motion. *Id.* The court found the hours expended "somewhat excessive," instead awarding fees for <u>three hours</u>. *Id.* at *2 (basing the lodestar amount on three hours at an hourly rate of $265).

Likewise, here, the Court finds Defendants' report that they expended 16.5 hours to prepare and file the motion to expunge is excessive. The motion is not complex and is based on a well-settled statutory scheme. Moreover, Plaintiffs took steps to voluntarily withdraw the motion and there is no showing by Defendants how they expended time pre- and post-voluntary withdrawal.

7

Thus it is unclear how Kern County's rejection of the Plaintiffs' voluntary withdrawal impacted Defendants' billing. In other similar circumstances, courts evaluating fee awards for such work found that preparing such a motion should take a competent attorney approximately three to seven and a half hours. *See, e.g., Maxwell v. Deutsche Bank Nat'l Trust Co.,* No. 13CV03957WHOWHO, 2013 WL 6072109, at *3 (N.D. Cal. Nov. 18, 2013), *appeal dismissed* (July 22, 2014) (awarding attorneys' fees for a motion to expunge for 7.5 hours of related work); *Morgan v. Aurora Loan Servs., LLC,* 2014 WL 772763, at *2 (finding 5.5 hours excessive, but that 3 hours is a reasonable time expenditure to prepare a motion to expunge); *Quinto v. JPMorgan Chase Bank,* No. 5:11-CV-02920-LHK, 2012 WL 2792445, at *2 (N.D. Cal. July 9, 2012) (granting defendants' request for fees at a rate of $218.40 per hour, noting that counsel spent one hour drafting the motion); *cf. Doan v. Singh,* No. 1:13-CV-531-LJO-SMS, 2014 WL 3867418, at *4 (E.D. Cal. Aug. 6, 2014) (awarding $2,275.00 in attorneys' fees and costs to prevailing defendant associated with bringing a motion to expunge a lis pendens).

The Court will award fees at a prevailing market hourly rate of $285.00 for seven hours expended related to this motion, consistent with the recent similar cases. As a result, the Court finds the lodestar amount to be $1,995.00, a reasonable amount to award Defendants for attorneys' fees related to the instant motion.

Finally, the Court turns to Defendants' request that Plaintiffs and counsel be held jointly and severally liable for any fee award because the lis pendens was not properly filed with this Court or served pursuant to California Code of Civil Procedure § 405.22. In sole support of this argument, Defendants rely on an unpublished case, *Ritchie v. Cmty. Lending Corp.,* No. CV 09-02484DDP(JWJX), 2009 WL 2486575, at *3 (C.D. Cal. Aug. 12, 2009). However, because this unpublished out-of-district decision lacks legal justification, this Court finds it unpersuasive. Otherwise, Defendants do not offer and the Court cannot find other cases to support holding a parties' counsel jointly and severally liable in similar circumstances. Alternatively, if Defendants mean to move for Rule 11 sanctions, it is improperly done. The Court declines to impose sanctions.

//

//

### III.     CONCLUSION AND ORDER

For the foregoing reasons, the Court concludes that expunging the lis pendens is appropriate pursuant to California law. Cal. Code Civ. Proc. § 405.31-32. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion to expunge the lis pendens is **GRANTED**. Plaintiffs' notice of lis pendens, recorded on December 11, 2014 (as Document No. 0214153536), and a memorandum of agreement that Plaintiff recorded on June 13, 2014 (as Document No. 0214067557), both recorded in Kern County, are hereby expunged from the public record. *See* attached Ex. A (Memorandum Agreement) (filed in this case as Doc. 71-3, Ex. A); Ex. B (notice of lis pendens)(filed in this case as Doc. 71-3, Ex. B); *see also* Ex. 1 to Ex. B (property description) (filed in this case as Doc. 71-3, Ex. 1 to Ex. B). Finally, pursuant to Cal. Code Civ. Proc § 405.38, the Court awards Defendants $1,995.00 in attorneys' fees.

**IT IS SO ORDERED**
**Dated: September 30, 2015**

**/s/ Lawrence J. O'Neill**
**United States District Judge**

# EXHIBIT A

**James W. Fitch, Assessor – Recorder**
Kern County Official Records
Recorded at the request of
**Public**

BEARDSLE
6/13/2014
1:14 PM

DOC#: **0214067557**

| Stat Types: 1 | Pages: **54** |
|---|---|
| Fees | 172.00 |
| Taxes | 0.00 |
| Others | 3.00 |
| PAID | $175.00 |

RECORDING REQUESTED BY AND )
WHEN RECORDED MAIL TO: )
)
   William Barkett )
   800 Silverado Street #301 )
   La Jolla, CA 92037 )
)

## MEMORANDUM OF AGREEMENT

    **THIS MEMORANDUM** made this 16th day of April, 2014, for a Forbearance Agreement with Option to Buy by and between SENTOSA PROPERTIES, LLC, a Washington limited liability company, on the one hand ("Sentosa"), WASCO INVESTMENTS LLC, a California limited liability company, PARKER DAM DEVELOPMENT LLC, a California limited liability company, BARUSA LLC, a California limited liability company, MONTEREY FINANCIAL ADVISORS, LLC, a California limited liability company, WILLIAM AND LISA BARKETT (collectively "WILLC").

    Sentosa and WILLC have entered into that certain Agreement entitled "Forbearance Agreement" dated April 16, 2014 (the "Agreement") wherein Sentosa grants to WILLC an Option to Purchase the real property described in Exhibit "A" attached hereto and by this reference made a part hereof (the "Property") previously owned by WILLC Reference is made to the Agreement for the terms and conditions of same.

                      WASCO INVESTMENTS LLC, a California
                      Limited Liability Company, **"WILLC"**

                      By: _____

                      WILLIAM J. BARKETT, Managing
                      Member

RECORDERS MEMO:   POOR RECORDED
REPRODUCTION DUE TO QUALITY OF PRINT OR
TYPE ON ORIGINAL DOCUMENT.

## ACKNOWLEDGMENT

State of California   )
                ) ss.
County of San Diego )

On May 15, 2014, before me, Sonia E. Wolcott, Notary Public, personally appeared William J. Beckett, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) on behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



[Seal]

SONIA E. WOLCOTT
Commission # 2012027
Notary Public - California
San Diego County
My Comm. Expires Mar 14, 2017

7828-41\00310318.000

2

5

# EXHIBIT "A"
## [Legal Description]

Parcel 2

Parcel 2 of that certain Certificate of Compliance for Lot Line Adjustment 09-02, recorded November 02, 2009, as instrument No. 0209162732, in Official Records of Kern County, California, further described as follows:

The Southwest 1/4 of the Southwest 1/4, the Southeast 1/4 of the Southwest 1/4 and the Southwest 1/4 of the Southeast ¼ of Section 2, Township 27 South, Range 24 East, Mount Diablo Meridian, in the City of Wasco, County of Kern, State of California, as per the Official Plat thereof.

Excepting therefrom that portion conveyed to the State of California, by deed dated July 31, 1928 and recorded August 25, 1928 in book 262 at page 21 of Official Records of Kern County.

Also excepting therefrom Parcel A and B of Parcel Map Waiver No. 94-1, recorded October 09, 1995 as instrument No. 0195124515 of Official Records, said Parcels A and B comprising Parcel 1 of Parcel Map No. 6156, recorded December 15, 1981 in Book 27, page 82 of Parcel Maps.

Also excepting the west 30 feet and the south 40 feet included within public roads.

Also excepting therefrom that portion of the Southeast 1/4 of the Southwest 1/4 of Section 2, Township 27 South, Range 24 East, Mount Diablo Meridian, in the City of Wasco, County of Kern, State of California, as per the Official Plat thereof, described as follows:

Commencing at the Southwest corner of said Section 2; thence along the south line of the Southwest quarter South 89°21'35? East 1840.79 feet; thence North 00°38'48? East 918.40 feet to a line parallel with and 38.00 feet southerly of the North line of the South half of the Southwest quarter of said Section 2; thence along said parallel line, South 89°21'47? East 739.05 feet to a point distant North 89°21'47? West 20.00 feet from al line parallel with and 55.00 feet westerly of the mid-section line of said Section 2; thence South 43°35'29? East 27.90 feet to a point in last said parallel line, said point being distant South 01°10'09? West 20.00 feet from said parallel line previously described as being parallel with and 38.00 feet southerly of the north line of the South half of the Southwest quarter of said Section 2; thence along said parallel line, described as being parallel with and 55.00 feet westerly of the mid-section line of said Section 2, South 01°10'09? West 898.49 feet to a line which bears South 89°21'35? East and passes through the Point of Beginning; thence along said

line which bears South 89°21'35? East, North 89°21'35? West 750.32 feet to the Point of Beginning.

Also excepting from a portion of said land that interest in minerals rights, oil, other hydrocarbons, associated substances, sulfur, nitrogen, carbon dioxide, helium and other commercially valuable substances located underneath the real property as described and quitclaimed in that certain Quitclaim Deed recorded April 06, 2011 as instrument No. 0211-042749, Kern County Official Records.

APN: 487-010-63, 487-010-69

# EXHIBIT A

7

## FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT (the "Agreement") is made effective as of April 16, 2014 by and between WASCO INVESTMENTS, LLC, a California limited liability company ("Wasco"), PARKER DAM DEVELOPMENT, LLC, a California limited liability company (PDD), BARUSA, LLC, a California limited liability company ("Barusa") (Wasco, PDD, and Barusa being referred to herein collectively as "Borrowers"), MONTERREY FINANCIAL ADVISORS, LLC, a California limited liability company ("MFA"), WILLIAM J. BARKETT and LISA BARKETT, husband and wife ("Guarantors"), and SENTOSA PROPERTIES LLC, a Washington limited liability company ("Lender" or "Sentosa"). (Wasco, PDD, Barusa, Guarantors, and Sentosa may be referred to individually as a "party" or collectively as the "parties").

## RECITALS

A.   Wasco obtained a loan from WF Capital, Inc., a Washington corporation ("WF") in the original principal amount of Nine Million Seven Hundred Fifty Thousand and No/100 Dollars ($9,750,000) (the "9.75 MM Loan").

B.   The 9.75 MM Loan is evidenced by a Fourth Amended and Restated Commercial Promissory Note dated April 16, 2007 in the original principal amount of $9,750,000 where Wasco is the Maker and WF is the Holder (the "9.75 MM Note"). Pursuant to the 9.75 MM Note, the maturity date of the 9.75 MM Loan was December 31, 2008.

C.   The 9.75 MM Note is secured by a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the "9.75 MM DOT") dated April 16, 2007 among Wasco, as Grantor, Stewart Title of California, Inc., as Trustee, and WF, as Beneficiary, recorded on April 18, 2007 in Kern County, California, as Instrument No. 0207083896, encumbering certain real property located in Kern County, California, more particularly described therein subject to subsequent conveyances of record through the date of this Agreement (the "Wasco Property").

D1.   Wasco's obligations under the 9.75 MM Loan are further secured by that certain Guaranty dated April 16, 2007 entered into by Guarantors for the benefit of WF (the "9.75 MM Guaranty").

D2.   Sentosa is the successor-in-interest to WF of the beneficial interests under the 9.75 MM Loan, which interests include without limitation, the beneficial interests under the 9.75 MM Note, 9.75 MM DOT, and 9.75 MM Guaranty.

8

E.    Wasco obtained another loan from WF in the original principal amount of One Million One Hundred Fifty Thousand and No/100 Dollars ($1,150,000) (the "1.15 MM Loan").

F.    The 1.15 MM Loan is evidenced by a First Amended and Restated Commercial Promissory Note dated February 5, 2008 in the original principal amount of $1,150,000 where Wasco is the Maker and WF is the Holder (the "1.15 MM Note"). Pursuant to the 1.15 MM Note, the maturity date of the 1.15 MM Loan was December 31, 2008.

G.    The 1.15 MM Note is secured by a Deed of Trust, Security Agreement, Assignments of Rents and Leases and Fixture Filing (the "1.15 MM DOT") dated February 5, 2008 among Wasco, as Grantor, Stewart Title of California, Inc., as Trustee, and WF, as Beneficiary, recorded on February 20, 2008 in Kern County, California, as Instrument No. 0208025030 encumbering certain property in Kern County as described therein.

H1.    Wasco's obligations under 1.15 MM Loan are further secured by that certain Guaranty dated February 5, 2008 entered into by Guarantors for the benefit of WF (the "1.15 MM Guaranty").

H2.    Sentosa is the successor-in-interest to WF of the beneficial interests under the 1.15 MM Loan, which interests include without limitation, the beneficial interests under the 1.15 MM Note, 1.15 MM DOT, and 1.15 MM Guaranty.

I.    PDD obtained a loan from WF in the original principal amount of Six Hundred Fifty Thousand and No/100 Dollars ($650,000) (the "PDD Loan").

J.    The PDD Loan is evidenced by a Commercial Promissory Note dated September 30, 2008 in the original amount of $650,000 where PDD is the Maker and WF is the Holder (the "PDD Note"). Pursuant to the PDD Note, the maturity date of the PDD Loan was December 31, 2008.

K.    The PDD Note was secured by a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the "PDD DOT") dated September 30, 2008 among PDD, as Grantor, First American Title Insurance Company, as Trustee, and WF, as Beneficiary, recorded on September 30, 2008 in Kern County, California, as Instrument No. 0208156379, encumbering certain real property located in Kern County, California, more particularly described therein (the "PDD Property").

L1.    PDD's obligations under the PDD Loan are further secured by that certain Guaranty dated September 30, 2008 entered into by Guarantors for the benefit of WF (the "PDD Guaranty").

L2.   Sentosa is the successor-in-interest to WF of the beneficial interests under the PDD Loan, which interests include without limitation, the beneficial interests under the PDD Note, PDD DOT, and PDD Guaranty.

M.   Barusa obtained a loan from Bingo Investments, LLC, a Washington limited liability company ("Bingo"), in the amount of Twelve Million and no/100 Dollars ($12,000,000) (the "12 MM Loan").

N.   The 12 MM Loan is evidenced by a Commercial Promissory Note dated November 28, 2006, in the original principal amount of $12,000,000, where Barusa is the Maker and Bingo is the Holder (the "12 MM Note").

O1.   The 12 MM Note is secured by: (i) a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated November 28, 2006 and recorded in Stanislaus County, California, as Instrument No. 2006-0174385-00, encumbering certain real property located in Stanislaus County as described therein; (ii) a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated November 28, 2006 and recorded in Kern County, California, as Instrument No. 0206292733, encumbering certain real property located in Kern County as described therein (the "12 MM DOT"); (iii) Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated November 28, 2006 and recorded in Kern County, California, as Instrument No. 0206292736, encumbering certain real property located in Kern County described therein (the foregoing Deeds of Trust, Security Agreements, Assignments of Rents and Leases and Fixture Filing (i) and (iii) are collectively referred to herein as the "12 MM Supplemental DOTs" and the real property encumbered by the 12 MM Supplemental DOTs are collectively referred to herein as the "Barusa Property"); and (iv) Pledge and Security Agreement (Barkett & Merjan) dated the ____ day of February, 2008 (the "ESI Pledge") wherein William J. Barkett and Merjan Financial Corporation, a California corporation ("Merjan") are pledgors with respect to interests in Energy Systems International, LLC, a California limited liability company ("ESI").

O2.   Barusa's obligations under the 12 MM Loan are further secured by that certain Guaranty dated November 28, 2006 entered into by William J. Barkett for the benefit of Bingo (the "12 MM Guaranty").

P1.   On or about December 17, 2010, Bingo and WF entered into an Assignment Agreement, whereby Bingo assigned to WF the beneficial interests under the 12 MM Loan, and Bingo surrendered and transferred to WF all of its right, title, and interest in and to the 12MM Loan, which included, without limitation, the following: (i) 12 MM Note; (ii) 12 MM DOTs; (iii) ESI Pledge; and (iv) 12 MM Guarantee.

P2.   Sentosa is the successor-in-interest to WF of the beneficial interests under the 12 MM Loan, which interests include without limitation, the beneficial interests under the 12 MM Note, 12 MM DOTs, ESI Pledge, and 12 MM Guaranty.

Q.   The 9.75 MM Note, 9.75 MM DOT, 9.75 MM Guaranty, 1.15 MM Note, 1.15 MM DOT, 1.15 MM Guaranty, PDD Note, PDD DOT, PDD Guaranty, 12 MM Note, 12 MM DOTs, ESI Pledge, 12 MM Guaranty, and all other documents guaranteeing, evidencing, and/or securing the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, and/or 12 MM Loan, as may have been or may be subsequently amended, are collectively referred to as the "Loan Documents."

R.   Borrowers and Guarantors have been in default under the Loan Documents.

S.   Wasco, PDD, Guarantors, and WF entered into a Loan Forbearance Agreement dated effective September 2, 2009 (the "First Forbearance Agreement"). Pursuant to the First Forbearance Agreement, Wasco, PDD and Guarantors were obligated to make specified monetary payments to WF in exchange for WF's agreement to forebear from exercising its remedies under the 9.75 MM Loan, 1.15MM Loan, PDD Loan, and the loan of $375,000 by WF to Wasco (which has since been satisfied as of the date of this Agreement, the "375K Loan") as a result of defaults by Wasco, PDD, and Guarantors thereunder. Wasco, PDD, and Guarantors did not satisfy their obligations pursuant to the First Forbearance Agreement. The Forbearance Period, as defined under Section 2 of the First Forbearance Agreement, has lapsed leaving Sentosa with (i) no obligation to forbear, and (ii) the immediate and unrestricted right to enforce the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, 12 MM Loan, and Judgments.

T.   On March 26, 2010, WF filed a Complaint against Guarantors in the United States District Court, Western District of Washington, under Case No. 10-524 RSL (the "Litigation"). On August 3, 2010, the Court in the Litigation entered an Order granting WF's motion for summary judgment with respect to its claims for judgment and entered judgment against Guarantors as set forth therein (the "Judgment"). The Court subsequently awarded WF its costs and reasonable attorneys' fees in the Litigation. Thereafter, WF filed for and obtained a Sister State Judgment in California (the Washington Judgment and California Judgment collectively referred to herein as the "Judgments").

U.   Wasco, PDD, Barusa, Guarantors, and WF entered into a Second Forbearance Agreement made effective June 16, 2011 (the "Second Forbearance Agreement"). Pursuant to the Second Forbearance Agreement, Wasco, PDD, Barusa, and Guarantors were obligated to make specified monetary payments to WF in exchange for WF's agreement to forebear from exercising its remedies under the 9.75 MM Loan, 1.15MM Loan, PDD Loan, and 12 MM Loan. Wasco, PDD, Barusa, Guarantors, WF, and Sentosa entered into a First Amendment to Second Forbearance Agreement made effective November 1, 2012 (the "1st Amendment to Second Forbearance Agreement"), which agreement provided for, among other things, the immediate right of Sentosa to foreclose on any portion of the Wasco Property and to further provide Wasco an option to purchase the Wasco Property in accordance with the 1st Amendment to Second Forbearance Agreement. Wasco, PDD, Barusa, and Guarantors have breached their obligations under the Second Forbearance Agreement and the 1st Amendment to Second Forbearance

Agreement. Accordingly, Sentosa has (i) no obligation to forbear, and (ii) the immediate and unrestricted right to enforce the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, 12 MM Loan, Judgments, and ESI Pledge. Wasco's option to purchase any part of the Wasco Property has since lapsed and is of no further force or effect.

V.     Sometime after November 1, 2012, Sentosa's security interest in the PDD Property was lost to the foreclosure of the PDD Property by a senior lender, and the PDD Property is now owned by a third party. As a consequence of that foreclosure, Sentosa no longer has any security interest in the PDD Property and PDD no longer has any ownership interest in the PDD Property. However, PPD and Guarantors remain liable to Sentosa for the indebtedness under the PDD Loan.

W.     Sometime after November 1, 2012, the Barusa Property in Stanislaus and Kern Counties (other than the Wasco Property) were foreclosed by a senior lender and were lost to foreclosure. Sentosa no longer holds a security interest in the Barusa Property in Stanislaus or Kern Counties and Barusa is no longer is the owner of said property.

X.     The interests of WF under the various obligations owed by Borrowers and Guarantors to WF have been assigned to Sentosa, and Borrowers and Guarantors acknowledge and confirm that Sentosa is now the holder of all right, title, and interests of WF under the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, 12 MM Loan, and Judgments originally in favor of WF.

Y.     On or about April 16, 2014, Wasco entered into an Improvement Agreement with the City of Wasco relating to off-site improvements that are necessary for the development of the Wasco Property (the "Improvement Agreement"). Among other things, the Improvement Agreement calls for the termination of a Tax Sharing Agreement between Wasco (as successor to Merjan) and the City of Wasco in exchange for which the City of Wasco will, initially at its expense, install the off-site improvements necessary for the development of the Wasco Property and property immediately adjacent to the Wasco Property owned by Walmart. As part of the Improvement Agreement, Wasco is to benefit from a credit of $750,000 by the City of Wasco (the "Tax Credit"), based on the termination of the Tax Sharing Agreement, against the costs of the off-site improvements while Wasco remains obligated to pay the remaining balance of the costs of the off-site improvements to be constructed by the City of Wasco, as set forth in the Improvement Agreement, through an Assessment District to be established by the City of Wasco. The payments are to be made over a seven (7) year period without interest.

Z.     As a further part of the Improvement Agreement, Borrowers, Guarantors, and Sentosa agreed that Sentosa, which holds the first, second, and other secured mortgage lien positions on the Wasco Property, intends to foreclose on the Wasco Property in order to clear up the title and to facilitate the establishment of the Assessment District. Sentosa agreed to subordinate its position to the Assessment District in an amount not to exceed $2,304,185.00.

AA.   The parties desire to provide for an orderly transition to Sentosa of the benefits in favor of Wasco and the Wasco Property under the Improvement Agreement, along with the Tax Credit, in connection with Sentosa's foreclosure of the Wasco Property.

BB.   Wasco desires an option to purchase the Wasco Property from Sentosa in the event Sentosa completes its foreclosure of the 12 MM DOT against the Wasco Property, and Sentosa is willing to grant such an option pursuant to the terms and conditions of this Agreement.

CC.   Borrowers and Guarantors also desire to obtain from Sentosa, and Sentosa desires to grant to Borrowers, an agreement to temporarily forbear in the exercise of the rights and remedies provided to Sentosa under the Loan Documents and the Judgments, to the extent provided for herein, for a limited period of time in order to provide Borrowers and Guarantors with additional time to satisfy the obligations of Borrowers and Guarantors under the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, 12 MM Loan, and Judgments (collectively, "Indebtedness") subject to the terms, conditions, and provisions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the promises under this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.   <u>Loan Documents</u>.  The Loan Documents and Judgments constitute valid, binding, and fully enforceable obligations of Wasco, PDD, Barusa, and Guarantors respectively.  Under the terms of the 12 MM DOT, 9.75 MM DOT, and 1.15 MM DOT, Sentosa has valid, subsisting, fully perfected liens and security interests in the Wasco Property.

2.   <u>Judgments</u>.   The Judgments are valid, existing, and fully enforceable judgments in all respects against Wasco, PDD, Barusa, and Guarantors.

3.   <u>Acknowledgment of Defaults</u>.  Borrowers and Guarantors acknowledge, agree, and accept that any and all forbearance periods and/or options to purchase property in favor of any one of them under the First Forbearance Agreement, Second Forbearance Agreement, and/or the 1st Amendment to Second Forbearance Agreement, have lapsed and are of no further force or effect.  Borrowers and Guarantors further acknowledge and agree that each of Wasco, PDD, Barusa, and Guarantors is currently in default under the Loan Documents (collectively, "Defaults"), and that Guarantors are fully liable therefor as well as the 12 MM Loan, 9.75 MM Loan, 1.15 MM Loan, PDD Loan, and the Judgments. Borrowers and Guarantors further acknowledge that, as a result of such Defaults and Judgments, Sentosa is entitled to exercise its rights and remedies as provided for in the Loan Documents, including, without limitation, completion of foreclosure on the Wasco

7828-41\00309244.000

6

13

Property. Except to the extent expressly modified by this Agreement, the terms, conditions, and obligations of the Borrowers and Guarantors under the Loan Documents and Judgments remain in full force and effect. To the extent of any conflict in interpretation between this Agreement and any of the Loan Documents, this Agreement shall control.

4.    <u>Foreclosure and Tentative Map</u>.    Sentosa has initiated a non-judicial foreclosure of the 12 MM DOT and set a sale date of March 19, 2014 (thereafter continued to March 25, 2014, March 28, 2014, April 22, 2014, and April 25, 2014), which may be further continued at Sentosa's discretion. Borrowers, MFA, and Guarantors agree that they will take no action or cause any action that may impede, delay, hinder, or prevent such a foreclosure. In connection with Sentosa's foreclosure of the Wasco Property, Sentosa agrees to subordinate its interests in the Wasco Property, but only to the extent set forth in the documents attached hereto as Exhibit "A" and made a part hereof, by executing and delivering to the City of Wasco and Walmart the foregoing documents respectively. Sentosa may, at its discretion, provide the foregoing documents prior to its foreclosure of the Wasco Property. Borrowers, MFA, and Guarantors will cooperate with Sentosa in completing the processing of the current tentative and final maps for the development of the Wasco Property all of which are subject to Sentosa's approval. Borrowers and Guarantors acknowledge and agree that the tentative map prepared by PSOMAS and submitted to the City of Wasco (the "Tentative Map"), prior to the date of this Agreement, might need to be reconfigured or not recorded to facilitate or enhance the sale of portions of the Wasco Property; provided, however, the completion and finalization of the Tentative Map to facilitate the purchase or sale of any portion of the Wasco Property by any one of Borrower or Guarantors, as approved by Sentosa, will be at the sole expense of Borrowers, MFA, and Guarantors.

5.    <u>Forbearance</u>. During the Forbearance Period (defined below), Sentosa will forbear from: (a) the further exercise of its remedies under the Loan Documents, and (b) enforcing or executing on the Judgments. For purposes of this Agreement, the Forbearance Period is for a fixed period of time running from the date Sentosa receives a copy of this Agreement, fully executed by the parties, through the date which is the earlier of the following: (1) December 31, 2014; (2) the date of any breach, default, or failure to perform any covenant or obligation by any one of the Borrowers, Guarantors, or MFA under the terms of this Agreement, the Loan Documents, Improvement Agreement, or Development Agreement (defined below); (3) the failure by any one of the Borrowers, Guarantors, or MFA to timely make any forbearance payment to Sentosa under this Agreement; (4) any one of the Borrowers, Guarantors, or MFA files or becomes the subject of any bankruptcy, reorganization, insolvency, receivership, trusteeship, custodianship, or similar proceeding (an "Insolvency Proceeding"); or (5) any trustee, receiver, or creditor of any one of the Borrowers, Guarantors, or MFA, or any third party commences any action, suit, or proceeding against any one of the Borrowers, Guarantors, or MFA or seeks to invalidate, rescind, challenge, or take other action with respect to the transactions contemplated by this Agreement.

Borrowers, MFA, and Guarantors acknowledge and agree that by way of the foregoing forbearance, Sentosa is in no way waiving or releasing: (i) any of the Judgments or any portion thereof, (ii) any of the obligations of Borrowers and/or Guarantors under the Loan Documents; (iii) any of the Defaults; (iv) the right to continue foreclosing against the Wasco Property; or (v) any other event of default or breach under any of the Loan Documents or this Agreement. Sentosa is merely agreeing to forbear from exercising certain rights and remedies expressly subject to forbearance under this Agreement. The Development Agreement means that certain Development Agreement by and between Wasco and Walmart dated October 11, 2009, as amended, with respect to the Wasco Property and on-site improvements contemplated thereunder, and which agreement will be terminated effective as of the date of the trustee's sale under Sentosa's foreclosure of the 12 MM DOT. Borrowers, MFA, and Guarantors will pay to Sentosa an initial forbearance payment in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00 USD) in cash no later than ninety (90) days following the date of this Agreement (the "1st Forbearance Payment"). Provided that the Forbearance Period has not yet lapsed, expired, been terminated, or previously extended in accordance with this Agreement, Wasco may extend the Forbearance Period, during the month of December, 2014, by paying to Sentosa the additional sum of Five Hundred Thousand Dollars ($500,000.00 USD) to extend the Forbearance Period to December 31, 2015 (the "2nd Forbearance Payment"); provided, however, in the event Wasco is able to effect the closing of the sale of Parcels 5, 8, and 10 (as contemplated under the Tentative Map) or any other combination of parcels of the Wasco Property during the Forbearance Period where Sentosa receives at closing Net Proceeds from the sale of no less than Ten Million Dollars ($10,000,000.00) on or before September 30, 2014, Sentosa agrees to extend the Forbearance Period through December 31, 2015 without the payment of the 2nd Forbearance Payment. "Net Proceeds" for purposes of this Agreement shall be the net of the gross sales price from the closing of the sale of all/portions of the Wasco Property less any commissions, outstanding property tax amounts and insurance premiums including those previously paid for by Sentosa, any share of the fees due and/or paid for the proposed or existing Assessment District, payment to Sentosa of all costs incurred by Sentosa under the Declaration (defined below), payment of all costs incurred and associated with finalizing the Tentative Map as needed and/or approved by Sentosa, and normal closing costs associated with the sale. Once a forbearance payment is made to Sentosa, each such payment is non-refundable but will be applicable toward satisfaction of the Indebtedness, but only to the extent the Indebtedness is fully satisfied during the Forbearance Period. For purposes of this Agreement, the Declaration means that certain Declaration of Covenants, Conditions, Restrictions and Reciprocal Easements, recorded on November 2, 2009 in the Kern County Official Records as Document No. 0209162739, and that certain First Amendment to Declaration of Covenants, Conditions, Restrictions and Reciprocal Easements, recorded on August 13, 2012 in the Kern County Official Records as Document No. 0212110065, as subsequently amended (the "Declaration").

Order: Non-Order Search  Doc: KN:2014 00067557          Page 12 of 54          Created By: laura.marquez  Printed: 6/11/2015 12:50:51 PM PST

6. <u>Marketing.</u> Subject to the terms and conditions of this Agreement and so long as the Forbearance Period is in effect, Wasco shall have the exclusive right through December 31, 2014 to market the parcels of the Wasco Property that are proposed on the Tentative Map or, and if said map is not approved and recorded, parcels of the Wasco Property that are currently approved by the City of Wasco. If Wasco achieves, during the Forbearance Period and prior to December 31, 2014, the closing of any sale of the Wasco Property where Sentosa receives Net Proceeds of no less than Ten Million Dollars ($10,000,000.00), Sentosa agrees to extend Wasco's exclusive right to market the Wasco Property, for so long as the Forbearance Period is in effect, through December 31, 2015. Notwithstanding anything to the contrary, any marketing of the Wasco Property by any one of the Borrowers or Guarantors will at all times be in a commercially reasonably manner, present the Wasco Property and Sentosa in a favorable way, and be designed to maximize the recovery from any sale of the property. Borrowers, MFA, and Guarantors will keep Sentosa apprised in writing of the marketing of the Wasco Property and progress therewith on no less than a bi-weekly basis. In the event that Borrowers, Guarantors, or MFA sign any listing agreement for the Wasco Property, the listing agreement shall be a standard commercial vacant land listing agreement and shall be acceptable to Sentosa provided that the gross listing prices for the parcels are large enough (after taking into account any potential sales commissions, payment of taxes and assessments, reimbursement of Sentosa of the costs of Sentosa's foreclosure, and customary closing costs) to net Sentosa the corresponding amounts as set forth in Exhibit B (the "Minimum Price Schedule"). The listing agreement will be provided to Sentosa for its review prior to Wasco's execution, but in no event will Sentosa be required to be a party to the agreement. In the event that Wasco seeks a listing agreement for any portion of the Wasco Property below the Minimum Price Schedule respectively, Borrowers, MFA, and Guarantors must first obtain Sentosa's consent to the listing agreement before entering into any such listing agreement. Nothing herein shall be read to prohibit Sentosa from receiving unsolicited offers or inquiries for the sale of some or all of the Wasco Property during the Forbearance Period. If during the Forbearance Period, Sentosa receives an unsolicited offer for some or all of the Wasco Property that would be acceptable to Sentosa, Sentosa shall immediately notify Wasco of the offer, the nature of the inquiry, the terms proposed, etc. Borrowers, MFA, and Guarantors shall promptly contact the potential buyer or buyers and proceed to negotiate with the potential buyer or buyers and Sentosa; provided, however, the sale will be free of any sale or brokerage commission.

7. <u>Option to Purchase.</u> If Sentosa completes a foreclosure sale of the Wasco Property and becomes the owner thereof as the winning bidder at the sale, and absent any challenge to the sale by any party other than Sentosa, MFA shall have during the Forbearance Period, the option to purchase existing salable parcels of the Wasco Property from Sentosa pursuant to the terms and conditions of this Agreement (the "Option"); provided, however: (a) the purchase price for the Wasco Property under the Option must provide Net Proceeds to Sentosa of no less than the corresponding amounts set forth in the Minimum Price Schedule; and (b) Guarantors will at all times be the sole members of MFA

16

from the date of this Agreement through all closings of MFA's purchase(s) of portions of the Wasco Property. If MFA desires to acquire portions of the Wasco Property in any configuration inconsistent with the Tentative Map, the minimum price for each such parcel shall be subject to Sentosa's approval in Sentosa's sole discretion.

The Option is personal to MFA and is not assignable by law or otherwise to any other party, and shall only be exercisable during the Forbearance Period by written notice to Sentosa by way of delivering to Sentosa a purchase and sale agreement executed by MFA, in the form attached hereto as Exhibit "C" and made a part hereof, without any additional contingencies other than: (i) the requirement that MFA shall have until the earlier of sixty (60) days, or the sooner expiration of the Forbearance Period, to close the purchase of the respective portion of the Wasco Property in accordance with this Agreement; (ii) Sentosa's completion and recordation of the final Tentative Map as applicable and at the expense of Borrowers, Guarantors, and MFA; (iii) there having been no challenge to (a) Sentosa's foreclosure of the Wasco Property, (b) the amounts due Sentosa under the Loans, or (c) Sentosa's collateral positions on the Wasco Property, (iv) there being no impediment to Sentosa's ability to convey clear title to the Wasco Property; and (v) be subject to perpetual easements in favor of the Wasco Property owned and/or sold by Sentosa for vehicular and pedestrian roadway access as well as utilities and the right to connect thereto at no expense to Sentosa or its successors and assigns. Borrowers, MFA, and Guarantors represent and warrant to Sentosa that the form of the agreement, attached hereto as Exhibit "C" as modified, is in compliance with California law and a valid agreement. So long as the Forbearance Period is in effect, Wasco shall have the right to work with the City of Wasco, Walmart, and others to complete the development and entitlements of the Wasco Property; provided, however, nothing shall become binding upon any portion of the Wasco Property, not purchased from Sentosa by MFA, without Sentosa's prior approval which approval Sentosa may withhold in its absolute discretion. Borrower and Guarantors will keep Sentosa informed in writing, on no less than a bi-weekly basis, of any and all such work related to the Wasco Property. Except for the contemplated facility serving the Walmart parcel, all retention facilities constructed on the Wasco Property owned by Sentosa will be installed underground and permitted by the City of Wasco as such, and the responsibility for retention areas will be shifted to the City of Wasco (or other municipality) as soon as practically possible. Retention facilities constructed on any portion of the Wasco Property purchased by MFA from Sentosa will be installed underground only if that is economically feasible. Sentosa will, during the Forbearance Period, cooperate with Borrowers, MFA, and Guarantors to complete the development work that is required for the parcels of the Wasco Property purchased from Sentosa; provided, however, any cooperation by Sentosa must be at no liability or expense to Sentosa or affect any portion of the Wasco Property owned by Sentosa. Subject to the terms and conditions of this Agreement, Sentosa, Borrowers, MFA, and Guarantors will cooperate with one another to get the offsite improvements completed in accordance with the Improvement Agreement provided such cooperation by Sentosa is at no expense or liability to Sentosa. Borrowers, MFA, and Guarantors, at their sole expense, will timely

pay prior to delinquency all real property taxes and assessments as and when due and/or accruing with respect to the Wasco Property through the end of the Forbearance Period. Failure to pay the property taxes as and when due shall not terminate the Option or the Forbearance Period provided that no tax sale or enforcement action is noticed by the County of Kern or corresponding agency or municipality. In the event a tax sale or enforcement action is noticed during the Forbearance Period then in effect, if any, Sentosa shall following its receipt of notice, promptly notify MFA of the tax sale/enforcement action and Borrowers, MFA, and Guarantors shall have the option of paying all past due taxes and assessments within ten (10) days to avoid the tax sale/enforcement action, to keep the Forbearance Period from lapsing. If any one of the Borrowers, MFA, or Guarantors subsequently sells any portion of the Wasco Property, prior to the full and complete satisfaction of the Indebtedness, Borrowers, MFA, and Guarantors agree to pay to Sentosa the positive difference between: (a) the gross sales price plus all other consideration for the sale; over (b) the gross sale price for the purchase from Sentosa (prorated if less than the entire parcel is subsequently sold).

8.   Foreclosure Process.   Sentosa has initiated a non-judicial foreclosure of the 12 MM DOT and set a sale date of March 19, 2014 (thereafter continued to March 25, 2014, March 28, 2014, April 22, 2014, and April 25, 2014) which may be further continued at Sentosa's discretion. Borrowers, MFA, and Guarantors agree that they will take no action or cause any action that may impede, delay, hinder, or prevent the foreclosure. If a third party bidder appears at Sentosa's trustee sale in foreclosure of the 12 MM DOT and bids, Sentosa agrees to bid up to Twenty-Four Million Three Hundred Forty Five Thousand Six Hundred Forty Two and 93/100 Dollars ($24,345,642.93) of the Indebtedness, or such lesser amount, as necessary to be the successful bidder at the sale; provided, however, Sentosa may in its sole discretion bid more than $24,345,642.93 at the sale. If Sentosa receives no less than Twenty Five Million Dollars ($25,000,000.00) for the Wasco Property from the foreclosure of the 12 MM DOT in connection with the winning bid by another party (the "Winning Minimum Bid"), Sentosa agrees to provide the Covenant Not to Enforce pursuant to the terms and conditions of Section 11 below; provided, however and notwithstanding anything in this Agreement or otherwise to the contrary, Sentosa retains all rights to collect the balance of the Indebtedness, at the default rate under Column D of the table in Section 9 below, against parties other than Borrowers, MFA, or Guarantors and/or through any liens on any portion of the Wasco Property in favor of Sentosa and/or WF that may survive foreclosure of the 12MM DOT.

9.   Pay Off Amounts.   If Sentosa is the winning bidder at its foreclosure of the 12 MM DOT and further provided that during the Forbearance Period: (a) Sentosa receives Net Proceeds of Thirty One Million Dollars ($31,000,000.00) through a combination of sales of the Wasco Property by Sentosa and/or payment by Borrowers, MFA, and Guarantors by December 31, 2014; or (b) Sentosa receives Net Proceeds of Thirty Five Million Dollars ($35,000,000.00) through a combination of sales of the Wasco Property by Sentosa and/or payment by Borrowers, MFA, and Guarantors by December 31, 2015,

Sentosa agrees to quit claim to MFA the balance of the Wasco Property owned by Sentosa (the "Quit Claim Deed") and to provide the Covenant Not to Enforce and satisfaction of the Judgments pursuant to the terms and conditions of Section 11 below; provided, however, the recording fees and any conveyance expenses/taxes associated with the Quit Claim Deed will be borne solely by MFA and the Quit Claim Deed will be recorded no later than three (3) days following Sentosa's request.

10. <u>Discounted Loan Balances</u>. As of April 25, 2014, the discounted loan balances reflected in Column C of the table found below in this Section 9, were due and payable to Sentosa under the Loans, which amounts: (a) represent substantially discounted payoff balances that will continue to accrue interest from and after April 25, 2014 at eight percent (8%) per annum subject to penalties, fees, and other charges under the Loan Documents; and (b) will only be accepted by Sentosa after the Forbearance Period, in exchange for the Covenant Not to Enforce pursuant to the terms and conditions of Section 11 below, provided the Forbearance Period expires on December 31, 2014 or December 31, 2015, as the case may be, without any breach or default by any one of Borrowers, Guarantors, or MFA under this Agreement, the Loan Documents, or as otherwise provided causing an early end to the Forbearance Period. If the Forbearance Period should terminate or expire early (i.e., prior to December 31, 2014 or December 31, 2015 as the case may be) due to any breach or default by any one of Borrowers, Guarantors, or MFA under this Agreement, the Loan Documents, or otherwise, the Indebtedness will be reinstated to the fullest amounts with default interest having accrued from the original dates of default respectively as reflected in Column D of the table found below in this Section 9. Any payments received by Sentosa from any one of the Borrowers, Guarantors, or MFA towards repayment of the Loans will be applied by Sentosa to the various Loans and in amounts all determined in Sentosa's sole discretion:

| (A) Wasco Loans | (B) Loan Balance | (C) Total Debt under forbearance rate - 8% | (D) Total Debt under default rate - 36% |
|---|---|---|---|
| **$9.75MM&$1.15MM (3/31/2010)** | $10,825,298.31 | $10,825,298.31 | $10,825,298.31 |
| Accrued interest | | $3,574,754.06 | $16,086,393.29 |
| Late charges | | $1,532,680.47 | $1,532,680.47 |
| Accrued and unpaid loan fees | | $1,199,000.00 | $1,199,000.00 |
| Attorney fee | | $55,306.27 | $55,306.27 |
| Reconvey fee | | $400.00 | $400.00 |
| UCC termination fee | | $62.00 | $62.00 |
| | | | |
| **PDD Loan (3/31/2010)** | $645,715.76 | $645,717.76 | $645,716.76 |
| Accrued interest | | $213,230.02 | $959,535.11 |
| Late charges | | $66,473.69 | $66,473.69 |
| Accrued and unpaid loan fees | | $13,000.00 | $13,000.00 |
| Attorney fee and cost | | $551.50 | $551.50 |
| Reconveyance fee | | $200.00 | $200.00 |

7828-41\00309244.000

12

19

| | | | |
|---|---|---|---|
| UCC termination fee | | $62.00 | $62.00 |
| **Barusa Loan (4/1/2007)** | $12,874,628.86 | $12,874,628.86 | $12,874,628.86 |
| Accrued interest | | $7,384,314.91 | $33,229,417.09 |
| Late charges | | waived | waived |
| Accrued and unpaid loan fees | | waived | waived |
| Attorney fee and costs | | $29,564.36 | $29,564.36 |
| Reconveyance fee | | $200.00 | $200.00 |
| UCC termination fee | | $62.00 | $62.00 |
| **TOTAL** | **$24,345,642.93** | **$38,415,506.22** | **$77,518,551.70** |

Subject to the foregoing, interest and penalties will continue to accrue under the Loans subject to the terms and conditions of this Agreement and the respective Loan Documents. Borrowers, MFA, and Guarantors reaffirm the existence, validity, and enforceability of all of the Indebtedness under the Loan Documents and Judgments and forever waive and relinquish any and all claims, offsets or defenses that they may now or hereafter have the respect to the payment of the Indebtedness. Borrowers, MFA, and Guarantors agree that any claims that hereafter accrue against Sentosa shall, subject to Section 12 hereof, constitute independent causes of action, and shall not in any way create any right of offset or recoupment against, or defense to enforcement of, the Indebtedness, which shall be unaffected thereby.

11.  Covenant Not to Enforce. If Sentosa timely receives the Winning Minimum Bid pursuant to Section 8 above or full payment respectively in accordance with the provisions of Sections 9 or 10 above, and Borrowers, MFA, and Guarantors are in strict compliance with the terms of this Agreement, Sentosa covenants and agrees that, subject to satisfaction of the conditions listed below, it will not, at any time, make, demand, nor commence any lawsuit or action, whether in law or in equity, against Borrowers or Guarantors for the collection of any further amounts owing under the Loans or the Judgments except as otherwise provided in Section 8 above, and will provide Guarantors with a satisfaction for each of the Judgments and the Quit Claim Deed (Quit Claim Deed given only when there has been full payment of the Indebtedness pursuant to Sections 9 or 10 above):

a.  For a period lasting more than ninety-one (91) days (or longer pursuant to any preference period, claw-back period, or applicable law) following the date of the full and final payment to Sentosa:

i.  No trustee or receiver, or any other creditor of any one of Borrowers, Guarantors, or MFA or any third party has commenced any action, suit, or proceeding against Sentosa, WF, or any if its affiliates seeking to rescind any of the transactions contemplated hereby or otherwise attacks the validity thereof, in whole or in

part, including any such action in the context of a bankruptcy or receivership proceeding involving either any one of Borrowers, Guarantors, or MFA;

ii. No one of Borrowers, Guarantors, or MFA shall have filed or become the subject of any bankruptcy, reorganization, insolvency, receivership, trusteeship, custodianship, or similar proceeding;

ii. No one of Borrowers, Guarantors, or MFA shall have asserted any demand or defense, made any claim, filed any lawsuit or arbitration demand, or pursued any other action against Sentosa or any affiliate of Sentosa, other than for Sentosa's breach or default under this Agreement;

iii. No claim or demand shall have been asserted against Sentosa or WF with respect to this Agreement or any of the Loans, and no other events or circumstances shall exist with respect to any of the Loans for which either any one of the Borrowers, Guarantors, or MFA is otherwise obligated to provide defense or indemnity and as to which such Borrowers, Guarantors, or MFA has failed to provide such defense and indemnity;

iv. Borrowers, MFA, and Guarantors shall have provided their full cooperation to Sentosa or its assigns in accordance with the requirements of this Agreement; and

v. Sentosa shall have either obtained or waived the right to obtain, an owner's policy of title insurance, insuring Sentosa as the fee owner of the Wasco Property, from a title company or title companies acceptable to Sentosa showing no exceptions for monetary liens, financial liens, mechanic's liens, tax liens, or other liens or encumbrances not in favor of Sentosa, and Borrowers, MFA, and Guarantors shall have provided such affidavits, documents, or other information as may have been requested by the title company for issuance of such policies and endorsements.

b. Notwithstanding anything to the contrary: (i) the Covenant Not to Enforce shall expressly not include any claim or cause of action arising solely under this Agreement or from any breach or failure to perform any part of this Agreement by any one of Borrowers, Guarantors, or MFA; (ii) Guarantors shall remain obligated under any and all promises of indemnity in favor of Sentosa under the Loan Documents with respect to all claims, liabilities, losses, and expenses to which any one of the Guarantors, Borrowers, or MFA has knowledge of as of the date of this Agreement and relating to third-party claims, environmental liabilities, or matters other than Sentosa's failure or inability to receive full payment of the Loans; (iii) except as otherwise provided by this Agreement or to the extent any one of the Borrowers, Guarantors, or MFA should subsequently re-acquire title to any portion of the Wasco Property by purchase from Sentosa or its successors, the respective Guarantors, Borrowers, and MFA shall remain obligated to turn over to Sentosa any further income, profit, or proceeds of any portion of the Wasco Property received by

21

them for any reason subsequent to the transfer thereof, including, without limitation, any governmental reimbursements or refunds of any kind associated therewith, including refunds of deposits, and shall remit any such proceeds to Sentosa immediately upon receipt; and (iv) the release shall be binding only upon Sentosa and its assigns and shall not be binding on any subordinate lienholder that may be subrogated to Sentosa.

      c.     In the event that, with respect to any of the Loans or this Agreement, either any one of the Borrowers, Guarantors, or MFA shall: (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended ("Bankruptcy Code"), (ii) be the subject of any order for relief issued under the Bankruptcy Code, (iii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (v) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustments, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, and such action causes Lender or its nominee to seek necessary or appropriate relief: (a) Sentosa or its nominee shall thereupon be entitled to, and Borrowers, MFA, and Guarantors irrevocably consent to, the relief from any automatic stay imposed by Section 362 of Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to Sentosa as provided in this Agreement with respect to the Loans and as otherwise provided by law, and Borrowers, MFA, and Guarantors hereby irrevocably waive any right to object to such relief, and acknowledge that no reorganization in bankruptcy is feasible; (b) Borrowers, Guarantors, and MFA waive their exclusive right pursuant to Section 1121(b) of the Bankruptcy Code to file a plan of reorganization and irrevocably consent that Sentosa or its nominee may file a plan immediately upon the entry of an order for relief if an involuntary petition is filed against any one of the Borrowers, Guarantors, or MFA or upon the filing of a voluntary petition by any one of the Borrowers, Guarantors, or MFA; (c) in the event that Sentosa or its nominee shall move pursuant to Section 1121(d) of the Bankruptcy Code for an order reducing the 120-day exclusive period, neither any one of Borrowers or Guarantors will object to any such motion; and (d) Borrowers, MFA, and Guarantors waive any rights they may have pursuant to Bankruptcy Code Section 108(b).

      d.     Borrowers, MFA, and Guarantors hereby stipulate that Sentosa or its nominee's entitlement to relief from the automatic stay as set forth in the preceding paragraph shall be based on: (i) cause, including a lack of good faith in the filing of any bankruptcy case in the face of the substantial concessions granted by Sentosa or its nominee in this Agreement; (ii) the mutual recognition by Sentosa or its nominee, Borrowers, MFA, and Guarantors of the substantial concessions granted by Sentosa or its nominee to Borrowers, MFA, and Guarantors in this Agreement; (iii) the fact (hereby acknowledged

by Borrowers, MFA, and Guarantors) that Sentosa or its nominee cannot receive adequate protection of the value of its interest absent the ability to immediately foreclose against the Wasco Property and to exercise its other rights and remedies under the Loan Documents; (iv) the fact (hereby acknowledged by Borrowers, MFA, and Guarantors) that the Wasco Property is necessary to any viable plan of reorganization or liquidation and that significant ongoing financial burdens attend the operations of the same; and (v) the fact (hereby acknowledged by Borrowers, MFA, and Guarantors) that not any one of Borrowers, MFA, or Guarantors has equity in the Wasco Property.

12.   Assignment of Tax Sharing Agreement.  Wasco, represents and warrants to Sentosa that it is the sole beneficiary of the Tax Credit and hereby assigns to Sentosa the Tax Credit and further agrees to execute any and all documents requested by Sentosa to effect such assignment; provided, however, the effectiveness of the assignment is contingent upon Sentosa being the successful bidder under the foreclosure of any of its security interests in the Wasco Property. If Sentosa receives in cash any portion of the Tax Credit from the City of Wasco because the City of Wasco declines or fails to perform under the Improvement Agreement, or the costs end up being less than Wasco's allocable share thereof, Sentosa agrees to credit the amounts paid to Sentosa against the outstanding obligations owed by Borrowers and Guarantors to Sentosa. For purposes of clarity, any use or application of the Tax Credit towards any expense or construction of the off-site improvements pursuant to the Improvement Agreement will not be deemed to be a refund or disbursement to Sentosa of any portion of the Tax Credit or any payment towards the Indebtedness. In the event that Borrowers, MFA, or Guarantors purchase the Wasco Property pursuant to this Agreement during the Forbearance Period and Sentosa has received the agreed upon Net Proceeds (either $31 MM by the end of 2014 or $35 MM by the end of 2015), Sentosa will assign the Tax Sharing Agreement back to Wasco.

13.   Release and Waiver; Representations and Warranties of Borrowers, MFA, and Guarantors.

(a)   Borrowers, MFA, and Guarantors do hereby release, acquit and forever discharge Sentosa, WF, their successors, and predecessors in interest, and all of their respective past, present, and future officers, directors, shareholders, investors, members, managers, attorneys, affiliates, employees and agents (collectively, "Released Parties"), of and from any and all claims, demands, liabilities, indebtedness, breaches of contract, breaches of duty or of any relationship, acts, omissions, misfeasance, malfeasance, causes of action, defenses, offsets, debts, sums of money, accounts, compensation, contracts, controversies, promises, damages, costs, losses and expenses, of every type, kind, nature, description or character, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, that any one of Borrowers, MFA, and/or Guarantors now have or may accrue or acquire as of the date they have executed and delivered this Agreement to Sentosa (each, a "Released Claim" and collectively, the "Released Claims"), which Released Claims include without

limitation claims any one of the Borrowers and/or Guarantors may have with respect to the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, 12 MM Loan, ESI Pledge, or the Judgments.

(b)  Borrowers, MFA, and Guarantors each hereby acknowledge, represent, and warrant to Sentosa that:

(i)  they each agree to assume the risk of any and all unknown, unanticipated or misunderstood defenses and Released Claims which are released by the provisions hereof in favor of Sentosa and WF respectively. Borrowers, MFA, and Guarantors further waive and release all rights and benefits which they might otherwise have under any federal, state, or local laws or statutes with regard to the release of such unknown, unanticipated, or misunderstood defenses and the Released Claims.

(ii)  Borrowers and/or Guarantors are the sole and lawful owners of all right, title, and interest in and to all of the claims released hereby and Borrowers, MFA, and/or Guarantors have not heretofore voluntarily, by operation of law or otherwise, assigned or transferred or purported to assign or transfer to any party any such claim or any portion thereof. Borrowers, MFA, and Guarantors shall indemnify and hold harmless the Released Parties from and against any claim demand, damage, debt, liability (including payment of reasonable attorneys' fees and costs actually incurred whether or not litigation is commenced) based on or arising out of any breach or default of any warranty, representation, covenant, or obligation of any of the Borrowers, MFA, or Guarantors with respect to the any of the Released Claims or any of their obligations under this Agreement.

(iii)  The provisions of this Section 13 shall survive satisfaction of the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, and 12 MM Loan (collectively, "Loans"), full performance of all the terms of this Agreement and the Loan Documents, satisfaction of the Judgments, and/or Sentosa's actions or exercise of any remedy available to it under this Agreement, the Loan Documents, or Judgments.

(c)  All of the recitals set forth at the beginning of this Agreement are true and correct in all respects.

14.  Confidentiality. As a term and condition of this Agreement, the parties agree to keep confidential the terms, conditions, and information contained in this Agreement and not to disclose said information to any third-party other than their respective legal counsel or such family members, employees, or agents that have a reason to know its contents in order to implement or comply with its terms.

15.  Borrower's, MFA's, and Guarantor's additional Representations, Warranties, and Covenants. Borrowers, MFA, and Guarantors hereby respectively ratify and affirm their obligations respectively under the Loan Documents, the Loans, the Judgments, the Development Agreement, the Improvement Agreement, and this Agreement, including, but not limited to the representations, warranties, and covenants therein, all of which are

incorporated herein by reference and remain in full force and effect. Borrowers, MFA, and Guarantors also agree to timely and punctually fulfill the obligations of Wasco under the Development Agreement and Improvement Agreement.   This Agreement does not constitute a novation as to any of the foregoing and does not modify, alter, amend, or in any way affect the terms and conditions thereof except as expressly and specifically stated herein.  Borrowers, MFA, and Guarantors will perform all of their obligations under this Agreement, including the following additional representations, warranties, and covenants:

(a)     Company Existence and Authority.  As Sentosa is agreeing to forbear as provided in this Agreement in reliance on Borrowers', MFA's, and Guarantors' continued existence, ownership, and control of the respective entities in their present company form and in good standing, Borrowers, MFA, and Guarantors will not alter said company structures, ownership, or control without the prior written consent of Sentosa, and will do all things necessary to preserve and maintain said company existence and to ensure their continuous right to carry on business, including but not limited to, filing within the prescribed time all tax returns and reports, and paying when due all such taxes. Further, Borrowers, MFA, and Guarantors represent and warrant to Sentosa that they each have full power and authority to enter into this Agreement and that William J. Barkett and Lisa A. Barkett are, in their individual capacity, the owners and holders of all membership interests in Wasco, MFA, PDD, and BARUSA.

(b)     Confirmation of Nature of Loans.  The Loans secured by the 9.75 MM DOT, 1.15 MM DOT, PDD DOT, and 12 MM DOT are commercial loans, and the proceeds thereof were only used for commercial purposes.

(c)     No Additional Advances Under Loans.  Borrowers, MFA, and Guarantors hereby acknowledge that Sentosa is not obligated to fund any additional advances under any of the Loans.

(d)     Condition and Repair and Maintenance of Wasco Property.  The Wasco Property is free from damage and no matter has come to any one of MFA's, Borrowers', or Guarantors' attention (including, but not limited to, knowledge of any construction defects, nonconforming work, the existence of hazardous materials, or environmental issue) that would materially impair the value of the Wasco Property or as security for the Loans. Borrowers, MFA, and Guarantors will keep the Wasco Property in good condition and repair, which duty shall include ensuring that any future work on the Wasco Property under the Improvement Agreement and Development Agreement, if any, are timely and fully completed lien-free in a workmanlike manner defect-free with appropriate and defect-free materials; will pay when due all claims for labor performed and materials furnished therefore; will not commit, suffer or permit any act upon the Wasco Property in violation of law; will not subject the Wasco Property to any liens or claims other than those by or approved by Sentosa, and will do all other acts which from the character or use of the Wasco Property may be reasonably necessary and approved by

Order: Non-Order Search  Doc: KN:2014 00067557                    Page 22 of 54          Created By: laura.marquez   Printed: 6/11/2015 12:50:53 PM PST

Sentosa for the continued operation thereof in a safe and legal manner, the specific enumerations herein not excluding the general.

(e)   Insurance.  Throughout the Forbearance Period and for a ninety (90) day period thereafter, Borrowers, MFA, and Guarantors will maintain all appropriate insurance coverages current, including but not limited to builder's risk (if and when any construction or development activity is being performed), and specifically including the following:

(i)   Hazard.  Borrowers, MFA, and Guarantors will provide, maintain, and deliver to Sentosa, as further security for the faithful performance of this Agreement, insurance covering all risks in an amount equal to one hundred percent (100%) of the replacement cost of the Wasco Property and naming Sentosa as first loss payee under a form of mortgagee's non-contributory loss payable endorsement acceptable to Sentosa. The amount collected under any insurance policies required to be maintained by Borrowers, MFA, and Guarantors will be paid directly to Sentosa provided that any amounts remain due and owing to Sentosa under this Agreement.  To the extent that insurance proceeds are paid in excess of the then remaining balance due to Sentosa under this Agreement and the Loans, only the amount necessary to pay off the remaining balance shall be paid to Sentosa.  If there remains a balance due in excess of the amount of the proceeds, those proceeds would be paid over to Sentosa and may be applied by Sentosa in its sole discretion upon any indebtedness under this Agreement  and in such order as Sentosa may determine, or at the option of Sentosa, the entire amount so collected or any part thereof may be released to Borrower.  Sentosa shall in no case be obligated to see to the proper application of any amount paid over to Borrower except to the extent such payment was to be paid to Sentosa to be applied at the direction of Sentosa.  Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(ii)   Liability.  Borrowers, MFA, and Guarantors will maintain comprehensive general liability insurance covering the legal liability of Borrowers and Guarantors against claims for bodily injury, death,  and property damage occurring on, in, or about the Wasco Property.

(iii)   General Provisions.  All policies of insurance required to be maintained by Borrowers, MFA, and Guarantors shall be in form and substance and with companies acceptable to Sentosa, and contain waiver of any co-insurance clauses. Borrowers, MFA, and Guarantors acknowledge that Wasco may not be able to provide all of the insurance and liability coverage required of it under this Agreement not being the vested owner of the Wasco Property and that any and all such coverage may need to be obtained by Sentosa directly at the expense of Borrowers, MFA, and Guarantors.  Sentosa reserves the right, in its reasonable discretion, to increase the amount of the required coverages, require insurance against additional risks, or withdraw approval of any insurance company at any time and to obtain any coverage Borrowers, MFA, or Guarantors

Order: Non-Order Search  Doc: KN:2014 00067557                    Page 23 of 54              Created By: laura.marquez  Printed: 6/11/2015 12:50:53 PM PST

fail to secure or which Sentosa reasonably deems necessary the cost of which will be at the expense of Guarantors, MFA, and Borrowers and added to the indebtedness of the Loans. Sentosa shall not have the right to obtain and charge Borrowers, MFA, and Guarantors with insurance coverage unless Sentosa provides Borrowers, MFA, and Guarantors reasonable notice and an opportunity to obtain its own satisfactory coverage within ten (10) days. Borrowers, MFA, and Guarantors shall obtain renewals of any policies which expire and deliver evidence of such renewals (or, if requested by Sentosa, the original policy) to Sentosa no later than ten (10) days prior to the expiration date of the policy being replaced. All policies and renewals thereof shall contain provision for thirty (30) days' notice to Sentosa prior to any cancellation thereof. Notwithstanding any of the foregoing, Sentosa shall not be responsible for any such insurance or for the collection of any insurance moneys, or for any insolvency of any insurer or insurance underwriter.

(f) <u>Preservation of Entitlements</u>. Borrowers, MFA, and Guarantors shall, following Sentosa's approval, observe and comply with all requirements necessary to the continued existence and validity of all rights, licenses, permits, privileges, franchises, concessions, and entitlements relating to any existing or presently contemplated use of the Wasco Property, and to keep Sentosa apprised thereof.

(g) <u>Taxes, Assessments, and Other Liens</u>. Borrowers, MFA, and Guarantors will timely pay all real property taxes and assessments associated with the Wasco Property due and/or accruing prior to and/or during the Forbearance Period.

(h) <u>Sale, Transfer, or Encumbrance of Wasco Property</u>. Neither any one of Borrowers, MFA, or Guarantors may encumber any portion of the Wasco Property or any interest therein owned by Sentosa, or to cause or permit any change in the entity, ownership, or control of any one of the Borrowers, MFA, or Guarantors.

(i) <u>Financial and Operating Information</u>. On or before the dates specified for each of the financial and operating statements and reports specified below, Borrowers, MFA, and Guarantors will furnish all such statements and reports and such other information as Sentosa may reasonably request, all certified as to accuracy by Borrowers, MFA, and Guarantors or an independent outside accountant:

(i) Internally prepared financial statements of Borrowers, Wasco (including but not limited all agricultural operations on the Wasco Property, if any), MFA, and Guarantors, due quarterly within thirty (30) days of each quarter end;

(ii) CPA prepared financial statements of Wasco, MFA, and Guarantors, due annually within ninety days (90) days of year end; and

(iii) Wasco's, MFA's, and Guarantors' state and federal tax returns, due annually within thirty (30) days of filing.

Order: Non-Order Search  Doc: KN:2014 00067557          Page 24 of 54          Created By: laura.marquez   Printed: 6/11/2015 12:50:53 PM PST

(j)    Beginning May 1, 2014 Borrowers, MFA, and Guarantors hereby assign to Sentosa, and agree to pay to Sentosa on a semi-monthly basis, twelve percent (12%) of the gross income of Borrowers, MFA, and Guarantors collectively, which payments received by Sentosa will be applied to the Indebtedness.  The foregoing obligations of Borrowers, MFA, and Guarantors will survive the expiration or termination of the Forbearance Period and this Agreement.

(k)    Each of Borrowers, Guarantors, and MFA agree to execute and deliver any and all documents necessary to effect and fulfill the purposes of this Agreement as may be requested by Sentosa from time to time.

17.    <u>Security Agreement for Personal Property and Fixtures</u>.  To the extent any one of the Borrowers, MFA, and/or Guarantors owns or acquires any right, title, or interest in any personal property or fixtures in connection with the Wasco Property that is not already owned or encumbered by Sentosa, including any entitlements, approvals, engineering drawings, engineering contracts, contracts with third party consultants, reports prepared by third party consultants, permits and specifications, and any stored materials on site, Borrowers/Guarantors/MFA, as debtor respectively, grants to Sentosa, as secured party, a first priority and perfected security interest therein together with a first priority and perfected security interest in all other personal property of whatsoever nature wherever located or used or to be used in connection with any of the Wasco Property, and any products or proceeds thereof, including but not limited to the proceeds of agricultural activity or operations, if any, pursuant to the Uniform Commercial Code of the state of California (the "UCC"), on the terms and conditions contained herein except that where any provision hereof is in conflict with the UCC, this Agreement shall control.  This Section 17 shall be deemed to be a security agreement and authorization for Sentosa to make a fixture filing with respect to all property subject to the UCC.  Borrowers, MFA, and Guarantors authorize Sentosa to file such financing statements as Sentosa deems necessary or advisable to perfect the security interests herein granted, and to assign to Sentosa and execute a bill of sale in favor of Sentosa all right, title, and interest of Borrowers'/Guarantors'/MFA in such property promptly following the termination or expiration of the Forbearance Period.  In the event that Borrowers, MFA, and Guarantors satisfy the Indebtedness as provided for in this Agreement, Sentosa will release any and all claims to a security or other interest in said property and, if it has filed financing statements or other similar documents, will promptly release the financing statements or similar documents.

18.    <u>No Impairment of Liens</u>.  Nothing in this Agreement, nor the existence of the Judgments, shall alter or impair the liens or priority thereof under the Loans.  Borrowers, MFA, and Guarantors specifically waive any defense and claim arising under the federal, state or local laws of any jurisdiction that the Judgments altered, impaired, subordinated, released or otherwise affected Sentosa's liens under the Loans.

19.    <u>Intentionally Omitted</u>.

7828-4\00309244.000                        21

20.   Defaults Not Cured.   The parties hereto acknowledge and agree that Sentosa's entering into this Agreement will not in any way be considered to be a cure of any one of Borrower's or Guarantors' defaults under the Loan Documents or a discharge (partial or otherwise) with respect to the 9.75 MM Loan, 1.15 MM Loan, PDD Loan, or 12 MM Loan, ESI Pledge, or with respect to the obligations under the Judgments. Nothing contained herein nor the receipt and application of payments by Sentosa shall constitute a waiver by Sentosa of its rights to foreclose upon the Wasco Property, or to otherwise exercise any of the other rights and remedies of Sentosa as provided in the Loan Documents at any time, or from time to time, from and after the expiration of the Forbearance Period, nor shall any provision contained herein or the receipt and application of any payments result in Sentosa's being estopped from exercising such right or remedy from and after the expiration of the Forbearance Period. If any one of Borrowers fails in any way to fully and completely perform its obligations under the terms of this Agreement, if Sentosa has not already done so, Sentosa shall be entitled to proceed immediately to enforce its rights under any of the Loans, this Agreement, register and enforce the Judgments, and to pursue any and all other rights and remedies it may have under this Agreement, the Judgments, applicable law, or otherwise.

21.   No Modifications.   This Agreement is intended merely as an indulgence by Sentosa to allow Borrowers, MFA, and Guarantors a period of time to repay and fully satisfy the Loans, Improvement Agreement, and Development Agreement. This Agreement does not constitute a novation as to any of the Loans, Loan Documents, Judgments, Improvement Agreement, or Development Agreement and does not modify, alter, amend, or in any way affect the terms and conditions of the Loan Documents or the Improvement Agreement except as expressly and specifically stated herein. Borrowers, MFA, and Guarantors hereby acknowledge and agree that all payments required of any one of them under the terms of this Agreement may be merely payments in reduction of Borrowers' and/or Guarantors' preexisting obligations to Sentosa.

22.   No Defenses.   Each of Borrowers, MFA, and Guarantors hereby acknowledges and agrees that he, she, or it has no defenses, setoffs, or counterclaims, including any based upon any events or transactions occurring, or failing to occur, accruing on or prior to the date of this Agreement, related to any of the Loans or Judgments including the existence, validity, or enforceability thereof, Sentosa's foreclosure or enforcement under any of the Loans or Judgments, or to the exercise by Sentosa or WF of any of their respective rights and remedies under the Loan Documents or Judgments. To the extent any one of Borrowers, MFA, or Guarantors may have had any such defenses, setoffs, or counterclaims, each of the Borrowers, MFA, and Guarantors hereby forever waives, releases, and relinquishes the same.

23.   Entire Agreement.   This Agreement and exhibits thereto contain the entire agreement of the parties with regard to the subject matter hereof and, except as otherwise expressly stated in this Agreement, supersedes any and all prior agreements and

understandings with respect to the subject matter hereof. This Agreement may not be amended, modified, or revoked except by means of a written document executed by the parties.

24. <u>Attorneys' Fees</u>. If any party hereto brings suit to enforce its rights under this Agreement, or to recover damages for the breach hereof, the prevailing party shall be entitled to recover from the other party the costs and expenses, including reasonable attorneys' fees, incurred in such suit or on appeal or in any bankruptcy or other insolvency proceedings.

25. <u>Time</u>. Time is of the essence of this Agreement. Any failure by any party to fully perform that party's obligations at or prior to the time required by this Agreement shall be conclusively deemed to be a material breach of this Agreement.

26. <u>Governing Law</u>. This Agreement is made in, and shall be governed and interpreted in accordance with the laws of the state of Washington. Venue for any action shall lie in federal or state courts within the City of Seattle, King County, Washington.

27. <u>Binding Effect</u>. This Agreement shall be binding upon the parties hereto and their respective heirs, successors, personal representatives, and assigns; provided, however, that the foregoing shall not authorize any assignment by any one of the Borrowers, Guarantors, or MFA of their rights or duties hereunder.

28. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts, by facsimile, and by each party on separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same agreement.

29. <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

30. <u>Adverse Construction</u>. The parties acknowledge and agree that this Agreement has been fully reviewed and negotiated by them, and accordingly that the doctrine of "adverse construction," and other similar principles of contract construction and interpretation, shall not apply to this Agreement.

31. <u>Independent Legal Counsel</u>. Each of Sentosa, Borrowers, MFA, and Guarantors acknowledges, represents, and agrees that he, she, or it has read this Agreement and fully understands the terms hereof, that each of Sentosa, Borrowers, MFA, and Guarantors has either been or waived the opportunity to be fully advised by his, her, or its legal counsel with respect hereto, and that the same is executed by each of Sentosa, Borrowers, MFA, and Guarantors as their free and voluntary act.

7828-41\00309244.000

23

30

WAIVER OF JURY TRIAL. SENTOSA, BORROWERS, MFA, AND GUARANTORS HEREBY KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE ANY AND ALL RIGHTS THAT EACH TO THIS AGREEMENT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR THE STATE OF WASHINGTON, TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY TRANSACTIONS CONTEMPLATED THEREBY.

SENTOSA, BORROWERS, MFA, AND GUARANTORS UNDERSTAND THAT THIS WAIVER IS A WAIVER OF A CONSTITUTIONAL SAFEGUARD AND EACH PARTY INDIVIDUALLY BELIEVES THAT THERE ARE SUFFICIENT ALTERNATE PROCEDURAL AND SUBSTANTIVE SAFEGUARDS, INCLUDING A TRIAL BY AN IMPARTIAL JUDGE, THAT ADEQUATELY OFFSET THE WAIVER CONTAINED HEREIN.

BORROWERS:                              SENTOSA:

WASCO INVESTMENTS, LLC                  SENTOSA PROPERTIES LLC
a California limited liability company  a Washington limited liability company


By: _____        By: _____
Its: Manager                           Its: Manager


PARKER DAM DEVELOPMENT, LLC
a California limited liability company


By: _____
Its: Manager


BARUSA, LLC
a California limited liability company


By: _____
Its: Manager

///

Order: Non-Order Search  Doc: KN:2014 00067557          Page 28 of 54          Created By: laura.marquez   Printed: 6/11/2015 12:50:54 PM PST

MFA:

MONTERREY FINANCIAL ADVISORS, LLC
a California limited liability company

By: _____
Its: Manager – Non member

GUARANTORS:

_____
William J. Barkett

_____
Lisa Barkett

State of California   )
                     ) ss.
County of San Diego )

On April 28, 2014, before me, Sonia E. Wolcott Notary Public, personally
appeared WILLIAM J. BARKETT, who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity(ies), and that by
his signature(s) on the instrument the person(s), and/or the entity(ies) on behalf of which
the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____   [Seal]


SONIA E. WOLCOTT
Commission # 2012027
Notary Public - California
San Diego County
My Comm. Expires Mar 14, 2017

State of California   )
                      ) ss.
County of San Diego )

On April 28, 2014, before me, Sonia E Wolcott, Notary Public, personally appeared LISA BARKETT, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity(ies), and that by her signature(s) on the instrument the person(s), and/or the entity(ies) on behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____            [Seal]

SONIA E. WOLCOTT
Commission # 2012027
Notary Public - California
San Diego County
My Comm. Expires Mar 14, 2017

State of Washington )
                    ) ss.
County of King      )

I certify that I know or have satisfactory evidence that H. ARNOLD HUANG is the person who appeared before me, and that said person acknowledged signing this instrument as the Manager of Sentosa Properties LLC, and acknowledged that he signed the same as his free and voluntary act and on oath stating that his powers authorizing the execution of this instrument have not been revoked.

DATED: _____

[STAMP]                    _____
                           Print Name: _____
                           NOTARY PUBLIC in and for the State of
                           Washington Residing at _____
                           My appointment expires: _____

7828-41\00309244.000                26                                    33

Order: Non-Order Search  Doc: KN:2014 00067557        Page 30 of 54        Created By: laura.marquez   Printed: 6/11/2015 12:50:54 PM PST

EXHIBIT "A"
(Waiver and Subordinations)

7828-41\00309244.000

34

## PETITION AND WAIVER

1.     We, the undersigned, are respectively the owners of and the mortgagees or beneficiaries of a mortgage or deed of trust upon all or a portion of, the lots and parcels of land within the proposed assessment district (the "Assessment District") more particularly described as Parcel 2 of Lot Line Adjustment No. 09-02, recorded as Instrument No. 0209162732 on November 2, 2009 in the Official Records of the Recorder of the County of Kern, State of California ("Parcel 2") and incorporated herein by this reference.

2.     We hereby file with the City Clerk of the City of Wasco, this Petition and Waiver in order to petition the City Council of the City of Wasco to undertake proceedings for the formation of the Assessment District pursuant to the Municipal Improvement Act of 1913, commencing with California Streets and Highways Code Section 10000, (the "1913 Act") for the purposes of assessing the lots and parcels within the Assessment District to pay for the owners' share of the following improvements (the "Improvements"):

(a)     Street Improvements.   The construction and/or acquisition of streets consisting generally of grading and paving streets, installation of driveways, curbs, gutters, sidewalks, medians, landscaping, streetlights and conduits, signing and striping, relocation of utilities, and signalization for improvement of the following roadways: Highway 46, Central Avenue, and Margalo Street.

(b)     Water Improvements.   The construction and/or acquisition of a twelve inch water line in Central Avenue and Margalo Street.

(c)     Sewer Improvements.   The construction and/or acquisition of an eight inch sewer lateral in Central Avenue and a manhole.

(d)     Storm Drain Improvements.   The construction and/or acquisition of storm drain catch basins in Central Avenue and Margalo Street and an eighteen inch storm drain pipe.

3.     We understand: (i) that the present best estimate of the cost of the Improvements is $4,285,335, (ii) that the owners' share of such costs, including incidental and financing costs, will not exceed $2,304,184, (iii) that the final cost of the Improvements may or may not exceed such estimate, and (iv) that after completion of the Improvements, the city shall determine the amount of the surplus, if any, remaining in the improvement fund by reason of the assessment levied for the Improvements, and dispose of such surplus funds in accordance with the 1913 Act which shall include, without limitation, reduction of the payments under the Payment Plan described in Paragraph 6.2 of the Improvement Agreement hereinafter described.

4.     We understand that an engineer's report will be prepared for the Assessment District, including plans and specifications for the Improvements, a detailed cost estimate, and an apportionment of the costs to the benefitted parcel, and that the City will conduct a public hearing on the engineer's report.   In the event there may be multiple parcels, the cost of the Improvements will be apportioned among the parcels in proportion to the special benefits that the parcels will receive with such special benefits measured by a parcel's percentage share of the total acreage of the property within the Assessment District.

35

5.      We hereby expressly waive the requirement, if any, that the City of Wasco or a public utility agree to pay any costs of the Improvements in connection with the conversion of existing overhead facilities to underground locations.

6.      We hereby expressly waive all investigation and other proceedings, if any, required and all limitations, if any, under the "Special Assessment Investigation, Limitation and Majority Protest Act of 1931" (commencing with Section 2800 of the California Streets and Highways Code) (the "1931 Act") and consent to the formation of the Assessment District and inclusion of Parcel 2 in same under the terms of the Off-Site Public Improvement Agreement dated April 15, 2014 by and between the City of Wasco, a municipal corporation, and WASCO INVESTMENTS LLC, a California limited liability company (the "Improvement Agreement"). We understand that signing this Petition and Waiver is not a waiver of our right to protest the assessment proceedings for the Improvements.  However, we understand that by signing this Petition and Waiver, we waive any right we may have to stop the formation of the Assessment District through filing a majority protest under the 1931 Act.  If the Improvement Agreement is terminated or abandoned by the City Council, this Petition and Waiver will be of no further force or effect, except to the extent of any provisions that are to expressly survive, and be promptly returned to Sentosa.

7.      We understand that the City Council must abandon the proceedings to form the Assessment District in the event of a majority protest under Article XIIID of the California Constitution.  A majority protest exists under Article XIIID if, at the conclusion of the public hearing on the Assessment District, the ballots submitted (and not withdrawn) in opposition to the proposed assessments exceed the ballots submitted (and not withdrawn) in favor of the assessments, with ballots weighted according to the proportional financial obligation of the affected properties.

8.      We understand that in the absence of a majority protest (as defined in the preceding paragraph 7) the City Council may, following the conclusion of the public hearing on the Assessment District, confirm the proposed assessments and order the Improvements.  We also understand that the City Council may make changes in connection with the Assessment District, including but not limited to, changes to the proposed Improvements (including the elimination of improvements) and cost estimates (including line items in the final engineer's report); provided, however, this Petition and Waiver will not be deemed as consent to any increase in the amount of any individual assessment beyond the amount set forth in paragraph 3 of this Petition and Waiver.

9.      This Petition and Waiver may be signed in counterparts.  When signed, return to:

City Clerk
764 E Street
Wasco, California 93280


THE UNDERSIGNED HEREBY WARRANTS, REPRESENTS AND DECLARES UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA that the undersigned is the owner of the property described below; that the names of all

36

mortgagees and beneficiaries under any existing mortgages or deeds of trust encumbering the property are as set forth in Exhibit A without any representation as to lien priority, attached hereto and incorporated herein; and that, except for the names set forth in Exhibit A, there are no mortgagees or beneficiaries of mortgages or deeds of trust encumbering the property described below.

**Description of Property: APN 487-010-69**
Wasco Investments LLC, a California Limited Liability Company

BY: _____        DATED: _4-28-14_
Its Duly Authorized Officer

        THE UNDERSIGNED HEREBY WARRANTS, REPRESENTS AND DECLARES UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA that the undersigned: (i) is the mortgagee or beneficiary of a mortgage or deed of trust upon all or a portion of the property described above, (ii) joins in this Petition and Waiver with the above owner, and (iii) hereby consents to the proposed assessment levied against such property, which assessment shall constitute a lien on the property that is coequal to and independent of the lien for general taxes.

SENTOSA PROPERTIES LLC
a Washington limited liability company

BY: _____        DATED: _____
Its Manager

37

## SUBORDINATION

THE UNDERSIGNED, who is the beneficiary under those certain deeds of trust: (i) dated November 28, 2006 in which Wasco Investments LLC, a California Limited Liability Company is the Trustor and the undersigned is the beneficiary which was recorded on November 29, 2006 as Instrument No. 0206292733 in the Official Records of the County Recorder of the County of Kern, State of California; (ii) dated April 16, 2007 in which Wasco Investments LLC, a California limited liability company is the Trustor and the undersigned is the beneficiary which was recorded on April 16, 2007 as Instrument No. 0207083896 in the Official Records of the County Recorder of the County of Kern, State of California; (iii) dated February 20, 2008 in which Wasco Investments LLC, a California limited liability company is the Trustor and the undersigned is the beneficiary which was recorded on February 20, 2008 as Instrument No. 0208025030 in the Official Records of the County Recorder of the County of Kern, State of California; and (iv) dated June 16, 2008 in which Wasco Investments LLC, a California limited liability company is the Trustor and the undersigned is the beneficiary which was recorded on June 24, 2008 as Instrument No. 0208100263 in the Official Records of the County Recorder of the County of Kern, State of California (collectively, "Deeds of Trust") hereby subordinates the mortgage liens of the Deeds of Trust to only that portion of land legally described and accepted by the City pursuant to the Irrevocable Offer of Dedication attached hereto.

"Lender"

SENTOSA PROPERTIES, LLC
A Washington Limited Liability Company,

By: _____
　　　　NAME:
　　　　Its:

7828-41\00306739.000
W1215-Wasco_CA -- 1208148.1

38

## ACKNOWLEDGMENT

State of Washington   )
                     ) ss.
County of _____   )

      On _____, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) on behalf of which the person(s) acted, executed the instrument.

      I certify under PENALTY OF PERJURY under the laws of the State of Washington that the foregoing paragraph is true and correct.

      WITNESS my hand and official seal.

_____           [Seal]

7828-41\00306739.000
W1215-Wasco_CA -- 1208148.1

39

## EXHIBIT "B"
(Release Prices)

| | | | |
|---|---|---|---|
| Lot 1 | 2.3 | $12 | $1,202,256 |
| Lot 2 | 3.6 | $12 | $1,881,792 |
| Lot 3 | 8.2 | $12 | $4,286,304 |
| Lot 5 | 8.4 | $15 | $5,488,560 |
| Lot 6 | 8.5 | $10 | $3,702,600 |
| Lot 8 | 5.2 | $15 | $3,397,680 |
| Lot 9 | 12.3 | $10 | $5,357,880 |
| Lot 10 | 4 | $15 | $2,613,600 |
| Lot 11 | 33.9 | $7 | $10,336,788 |
| | 86.4 | | $38,267,460 |

7828-41\00309244.000

40

EXHIBIT "C"
(Form Sale Agreement)

7828-41\00309244.000

41

## VACANT LAND PURCHASE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

Dated: _____

1.   **OFFER:**

A.   This is an offer from *Monterrey Financial Advisors, LLC, a California limited liability company* , ("Buyer").

B.   The real property to be acquired is described as: _____

_____

_____ ,

situated in the unincorporated area of Napa County, California (the "Property").

C.   The **Purchase Price** offered is _____ **dollars**.

D.   **Close of Escrow** shall occur on _____ , (or ___ days After Acceptance).

E.   **Assignees.** Buyer represents that Buyer is purchasing the Property for his or her own use. The addition, deletion, or substitution of any person or entity under this Agreement or to title prior to Close of Escrow shall require Seller's written consent. Seller may grant or withhold consent in Seller's sole discretion.

2.   **FINANCIAL TERMS:**

A.   **Initial Deposit**: Buyer has given a deposit in the amount of to _____        $ *∅* _____ , by personal check made payable to First American Title Company which shall be held uncashed until Acceptance and then deposited within 3 business days After Acceptance with Escrow Holder.

B.   __ **Increased Deposit**: Buyer shall deposit with Escrow Holder an increased deposit in the amount of ........................ *∅* within ___ days After Acceptance. (or) ___ _____ .

C.   __ **First Loan In The Amount** of ........................ *∅* Buyer shall pay loan fees/points not to exceed _____

D.   X **All Cash Offer** (If checked) No loan is needed to purchase the property. Buyer shall, within 7 (or ___) days after Acceptance, provide Seller with written verification of sufficient funds to close this transaction.

E.   **Additional Financing Terms**: *NONE* _____

_____

F.   **Balance Of Purchase Price** (not including costs of obtaining loans and closing costs) in the amount of ................ _____ to be deposited with Escrow Holder within sufficient time to close escrow.

G.   **Purchase Price Total**        $ _____

VACANT LAND PURCHASE AGREEMENT           Buyer' Initials ( ___ / ___ )
Page 1 of 15                             Seller's Initials ( ___ / ___ )

42

H.    **Loan Applications:** Within 7 (or ___) days After Acceptance, Buyer shall provide Seller a letter from a lender or mortgage loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified above.

I.    **Verification Of Down Payment And Closing Costs:** Buyer (or Buyer's lender or loan broker pursuant to 2H) shall, within 7 (or ___) days After Acceptance, provide Seller with written verification of Buyer's down payment and closing costs.

J.    **Loan Contingency Removal:** (within 17 (or _∅_) days After Acceptance Buyer shall, as specified in paragraph 18, remove the loan contingency or cancel this Agreement; **or,** (___if checked) loan contingency shall remain in effect until the designated loans are funded.

K.    **Appraisal Contingency And Removal:** This Agreement is (or, if checked _X_, is **NOT**) contingent upon the Property appraising at no less than the specified purchase price. If there is a loan contingency, at the time the loan contingency is removed (or, if checked, ___ within 17 (or ___) days After Acceptance) Buyer shall, as specified in paragraph 18, remove the appraisal contingency or cancel this Agreement. If there is no loan contingency, Buyer shall, as specified in paragraph 18, remove the appraisal contingency within **17 (or _____)** days After Acceptance.

L.    **No Loan Contingency** (if checked _X_): Obtaining any loan in paragraphs 2C, 2E or elsewhere in this Agreement is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result Buyer does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

3.    **POSSESSION AND KEYS:** Possession and occupancy shall be delivered to Buyer at _6_ AM/PM on the date of Close of Escrow. The property shall be unoccupied, unless otherwise agreed in writing. Seller shall provide keys and/or means to operate all Property locks.

4.    **ALLOCATION OF COSTS** (if checked): This paragraph only determines who is to pay for the report, inspection, test or service mentioned. Who is to pay for any work recommended or identified by any such report is by the method specified in paragraph **12.**

A.    **Inspections and Reports:**
        (1)    Buyer shall pay for costs of testing to determine the suitability of soil for sewage disposal.
        (2)    Seller shall pay for a natural hazard zone disclosure report prepared by Hirst Consulting Services, LLC.
        (3)    Buyer shall pay for all physical inspections Buyer desires.
        (4)    Buyer shall pay if Buyer desires to have Property corners identified.

B.    **Escrow and Title:**
        (1)    Buyer shall pay the escrow fee. Escrow Holder shall be First American Title Company.
        (2)    Buyer shall pay for owner's title insurance policy to be issued by First American Title Company.

VACANT LAND PURCHASE AGREEMENT                     Buyer' Initials (___/___)
Page 2 of 15                                                            Seller's Initials (___/___)

43

*Buyer waives any and all rights to receive these disclosures to the extent waivable under California law.*

*Buyer*

**C.**     **Other Costs:** ~~Seller~~ shall pay County transfer tax.

**5.**     **STATUTORY DISCLOSURES AND CANCELLATION RIGHTS:** ✗

     **A.**     **Natural and Environmental Hazards:** Seller shall, within the time specified in paragraph 12, deliver to Buyer if required by Law: (i) earthquake guides (and questionnaire) and environmental hazards booklet; (ii) disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and (iii) disclose any other zone as required by Law and provide any other information required for those zones.

     **B.**     **Data Base Disclosure:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.megansLaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP code in which he or she resides. (Seller is not required to check this website. If Buyer wants further information, Seller recommends Buyer obtain information from this website during Buyer's inspection contingency period.)

**6.**     **SELLER DOCUMENTATION AND ADDITIONAL DISCLOSURE:** ✗

     **A.**     Within the time specified in paragraph 12, if Seller has actual knowledge, Seller shall provide to Buyer, in writing, the following information:

     **(1)**     **Legal Proceedings:** Any Lawsuits by or against Seller, threatening or affecting the Property, including any Lawsuits alleging a defect or deficiency in the Property, or any known notices of abatement or citations filed or issued against the Property.

     **(2)**     **Agricultural Use:** Whether the Property is subject to restrictions for agriculture use pursuant to the Williamson Act (Government Code sections 51200-51295).

     **(3)**     **Deed Restrictions:** Any deed restrictions or obligations *not of record.*

     **(4)**     **Farm Use:** Whether the Property is in, or adjacent to, an area with Right to Farm rights (Civil Code sections 3482.5 and 3482.6).

     **(5)**     **Endangered Species:** Presence of endangered, threatened, 'candidate' species, or wetland on the Property.

     **(6)**     **Environmental Hazards:** Any substances, materials, or products that may be an environmental hazard including, but not limited to, asbestos, formaldehyde, radon gas, lead-based paint, fuel or chemical storage tanks, and contaminated soil or water on the property.

     **(7)**     **Common Walls, Etc.:** Any features of the Property shared in common with adjoining landowners, such as walls, fences, roads, and driveways, and agriculture and domestic wells whose use or responsibility for maintenance may have an effect on the Property.

     **(8)**     **Landlocked:** The absence of legal or physical access to the Property.

VACANT LAND PURCHASE AGREEMENT               Buyer' Initials (____/____)
Page 3 of 15                                                  Seller's Initials (____/____)

44

(9)   **Easements/Encroachments:** Any encroachments, easements or similar matters that may affect the Property that are not of record.

(10)   **Soil Fill:** Any fill (compacted or otherwise), or abandoned mining operations on the Property.

(11)   **Soil Problems:** Any slippage, sliding, flooding, drainage, grading, or other soil problems.

(12)   **Earthquake Damage:** Major damage to the Property or any of the structures from fire, earthquake, floods, or landslides.

(13)   **Zoning Issues:** Any zoning violations, non-conforming uses, or violations of "setback" requirements.

(14)   **Neighborhood Problems:** Any neighborhood noise problems, or other nuisances.

B.   **Mello-Roos Tax; 1915 Bond Act:** Within the time specified in paragraph 18, Seller shall (i) make a good faith effort to obtain a notice from any local agencies that levy a special tax or assessment on the Property (or, if allowed, substantially equivalent notice), pursuant to the Mello-Roos Community Facilities Act, and Improvement Bond Act of 1915, and (ii) promptly deliver to Buyer any such notice obtained.

7.   **SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Buyer is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure or notice, in writing, covering those items. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.**

8.   **CONDITIONS AFFECTING PROPERTY:**

a.   **(i) The Property is sold (a) in its PRESENT physical condition as of the date of Acceptance ~~and (b) subject to Buyer's Investigation Rights;~~ and (ii) the Property is to be maintained in substantially the same condition as on the date of Acceptance.**

b.   **Seller shall, within the time specified in paragraph 12, ~~disclose known material facts and defects affecting the property and~~ make other disclosures required by Law.**

c.   **NOTE TO BUYER: You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important.** Property Improvements may not be built according to code, incompliance with current Law, or have had permits issued.

d.   ~~NOTE TO SELLER: Buyer has the right to inspect the Property and, as specified in paragraph 12, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.~~

VACANT LAND PURCHASE AGREEMENT
Page 4 of 15

Buyer' Initials ( _/_ )
Seller's Initials ( _/_ )

45

9.    **BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

A.    Buyer's acceptance of the condition of and any other matter affecting the Property is a contingency of this Agreement, as specified in this paragraph and paragraph 12. Within the time specified in paragraph 12, Buyer shall have the right, at Buyer's expense, unless otherwise agreed, to conduct inspections, investigations, test, surveys, and other studies ("**Buyer Investigations**"), including, but not limited to, the right to (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms; (iii) review the registered sex offender database; (iv) confirm the insurability of Buyer and the Property; and (v) satisfy Buyer as to any matter specified below. Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations; or (ii) inspections by any governmental building or zoning inspector, or government employee, unless required by Law.

B.    Buyer shall complete Buyer Investigations and, as specified in paragraph 12, remove the contingency or cancel this Agreement. Buyer shall give Seller, at no cost, complete copies of all Buyer Investigations reports obtained by Buyer. Seller shall make Property available for all Buyer Investigations.

**Buyer is strongly advised to investigate the condition and suitability of all aspects of the Property and all matters affecting the value or desirability of the Property, including but not limited to, the items specified below. If Buyer does not exercise these rights, Buyer is acting against the advice of Seller and most real estate professionals. Buyer understands that although conditions are often difficult to locate and discover, all real property contains conditions that are not readily apparent and that may affect the value or desirability of the Property.**

(1)    Size, Lines, Access and Boundaries: Lot size, property lines, legal or physical access and boundaries including features of the Property shared in common with adjoining landowners, such as walls, fences, roads and driveways, whose use or responsibility for maintenance may have an effect on the Property and any encroachments, easements or similar matters that may affect the Property. (Fences, hedges, walls and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. Property lines may be verified by survey.) (Unless otherwise specified in writing, any numerical statements by Seller regarding lot size are approximations only, which have not been and will not be verified, and should not be relied upon by Buyer.)

(2)    Zoning and Land Use: Past, present, or proposed Laws, ordinances, referendums, initiatives, votes, applications and permits affecting the current use of the Property, future development, zoning, building, size, governmental permits and inspections. Any zoning violations, non-conforming uses, or violations of "setback" requirements. (Buyer should also investigate whether these matters affect Buyer's intended use of the Property.)

VACANT LAND PURCHASE AGREEMENT        Buyer' Initials ( __ / __ )
Page 5 of 15                          Seller's Initials ( __ / __ )

46

(3)    Utilities and Services: Availability, costs, restrictions and location of utilities and services, including but not limited to, sewerage, sanitation, septic and leach lines, water, electricity, gas, telephone, cable TV and drainage.
(4)    Environmental Hazards: Potential environmental hazards, including, but not limited to, asbestos, lead-based paint and other lead contamination, radon, methane, and other gasses, fuel, oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, including mold (airborne, toxic or otherwise), fungus or similar contaminant, materials, products or conditions.
(5)    Geologic Conditions: Geologic/seismic conditions, soil and terrain stability, suitability and drainage including any slippage, sliding, flooding, drainage, grading, fill (compacted or otherwise), or other soil problems.
(6)    Natural Hazard Zone: Special Flood Hazard Areas, Potential Flooding (inundation) Areas, Very High Fire Hazard Zones, State Fire Responsibility Areas, Earthquake Fault Zones, Seismic Hazard Zones, or any other zone for which disclosure is required by Law.
(7)    Property Damage: Major damage to the Property or any of the structures or non-structural systems and components and any personal property included in the sale from fire, earthquake, floods, landslides or other causes.
(8)    Neighborhood, Area and Property Conditions: Neighborhood or area conditions, including Agricultural Use Restrictions pursuant to the Williamson Act (Government Code sections 51200-51295), Right to Farm Laws (Civil Code sections 3482.5 and 3482.6), schools, proximity and adequacy of Law enforcement, crime statistics, the proximity of registered felons or offenders, fire protection, other government services, availability, adequacy and cost of any speed-wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor form any source, abandoned mining operations on the Property, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally-protected sites or improvements, cemeteries, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of the Buyer.
(9)    Manufactured Home Placement: Conditions that may affect the ability to place and use a manufactured home on the Property.

10.   **BUYER INDEMNITY AND SELLER PROTECTIONFOR ENTRY UPON PROPERTY:** Buyer shall (i) keep the Property free and clear of liens; (ii) Repair all damage arising from Buyer Investigations; and (iii) indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer' behalf to carry, policies of liability, workers' compensation and other applicable insurance,

VACANT LAND PURCHASE AGREEMENT          Buyer' Initials (___/___)
Page 6 of 15                                                       Seller's Initials (___/___)

47

defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

11.  **TITLE AND VESTING:**

    A.  Within the time specified in paragraph 12, Buyer shall be provided a current preliminary (title) report, which is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of the preliminary report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 12.

    B.  Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except: (i) monetary liens of record unless Buyer is assuming those obligations or taking the Property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing.

    C.  Within the time specified in paragraph 12, Seller has a duty to disclose to Buyer all matters known to Seller affecting title, whether of record or not.

    D.  At Close of Escrow, Buyer shall receive a ~~grant~~ *Quit Claim* deed conveying title, including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's supplemental escrow instructions. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

    E.  Buyer shall receive a standard coverage owner's CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyers desire title coverage other than that required by this paragraph, Buyer shall instruct Escrow holder in writing and pay any increase in cost.

12.  **TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph must be in writing.**

    A.  SELLER has **7** days After Acceptance to deliver to Buyer all reports, disclosures and information for which Seller is responsible under paragraphs 4, 5A, 6, 8C, and 11.

    B.  (1)  BUYER has: **1** day After Acceptance, unless otherwise agreed, in writing, to complete all Buyer Investigations; approve all disclosures, reports and other applicable information, which Buyer receives from Seller; and

VACANT LAND PURCHASE AGREEMENT           Buyer' Initials (\_\_\_/\_\_\_)
Page 7 of 15                               Seller's Initials (\_\_\_/\_\_\_)

48

approve all matters affecting the Property (including lead-based paint and lead-based paint hazards as well as other information specified in paragraph 5 and insurability of Buyer and the Property.

(2)   By the end of the time specified in 12B(1), Buyer may *not* request that Seller make Repairs or take any other action regarding the Property. Seller has no obligation to agree to or respond to Buyer's requests.

(3)   Within the time specified in 12B(1), Buyer shall remove, in writing, the applicable contingency or cancel this Agreement. However, if the following inspections, reports or disclosures are not made within the time specified in 12A, then Buyer ~~has 5 days after receipt of any such items, or the~~ *will have* ~~Waived~~ ~~time specified in 12B(1), whichever is later, to remove~~ the applicable contingency. ~~or cancel this Agreement in writing: (i) government-mandated inspections or reports required as a condition of closing; (ii) a subsequent or amended disclosure pursuant to paragraph 7, and (iii) Proposed Changes pursuant to paragraph 8.~~

~~C.   Continuation of Contingency or Contractual Obligation; Seller~~ **Right to Cancel**:

(1)   **Seller right to Cancel; Buyer's Contingencies**: Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit if, by the time specified in this Agreement, Buyer does not remove in writing the applicable contingency or cancel this Agreement. Once all contingencies have been removed, failure of either Buyer or Seller to close escrow in time may be a breach of this Agreement.

(2)   **Continuation of Contingency**: Even after the expiration of the time specified in 12B, Buyer retains the right to make requests to Seller, remove in writing the applicable contingency or cancel this Agreement until Seller cancels pursuant to 12C(1). Once Seller receives Buyer's written removal of all contingencies, Seller may not cancel this Agreement pursuant to 12C(1).

(3)   **Seller right to Cancel; Buyer Contract Obligations**: Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit for any of the following reasons: (i) if Buyer fails to deposit funds as required by 2A; (ii) if the funds deposited pursuant to 2A are not good when deposited. **Seller is not required to give Buyer a Notice to Perform regarding Close of Escrow.**

(4)   **Notice to Buyer to Perform**: The Notice to Buyer to Perform shall (i) be in writing; (ii) Signed by the Seller; and (iii) give Buyer at least 24 hours (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform may not be given any earlier than 2 days prior to the expiration of the applicable time for Buyer to remove a contingency or cancel this Agreement or meet an 12C(3) obligation.

D.   **Effect of Buyer's Removal of Contingencies**: If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively ~~be deemed to have (i) completed all Buyer Investigations, and review of reports~~

VACANT LAND PURCHASE AGREEMENT
Page 8 of 15

Buyer' Initials (___ / ___)
Seller's Initials (___ / ___)

49

~~and other applicable information and disclosures pertaining to that contingency or~~ cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility, and expense for Repairs or corrections pertaining to that contingency or cancellation right.

   E.     **Effect of Cancellation on Deposits:** ~~If Buyer or Seller gives~~ written Notice of Cancellation pursuant to rights duly exercised under the terms of this Agreement, Buyer and Seller agree to sign mutual instructions to cancel the sale and escrow and release deposits, less fees and costs, to the party entitled to the funds. Fees and costs may be payable to the service providers and vendors for services and products provided during escrow. **Release of funds will require mutual Signed release instructions from Buyer and Seller,** ~~judicial decision or arbitration award.~~

13.     **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within 5 days prior to Close of Escrow, NOT AS A CONTINGENCY OF THE SALE, ~~but solely to confirm: (i) the Property is maintained pursuant to paragraph 8A, (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligations under this Agreement.~~

14.     **ENVIRONMENTAL HAZARD CONSULTATION:** Buyer acknowledges: (i) Federal, state and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; (ii) Sellers have made no representations concerning the applicability of any such Law to this transaction or to Buyer or to Seller; and (iii) Buyer is advised to consult with technical and legal experts concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property.

15.     **LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award.

        **Buyer's initials: _____/_____     Seller's initials _____**

16.     **DISPUTE RESOLUTION:**
        A.     **Mediation:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. Paragraph 16B(2) below applies whether or not the Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this

VACANT LAND PURCHASE AGREEMENT              Buyer' Initials (___/___)
Page 9 of 15                                                Seller's Initials (___/___)

50

paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorneys fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

   B.   **Arbitration of Disputes:**

   (1) Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraph 16B(2) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of real estate transactional Law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall have the right to discovery in accordance with Code of Civil Procedure section 1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Interpretation of this agreement to arbitrate shall be governed by the Federal Arbitration Act.

   (2)   **Exclusions from Mediation and Arbitration:** The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code section 2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation and arbitration provisions.

   **"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ABBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISUPTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**

VACANT LAND PURCHASE AGREEMENT          Buyer' Initials (___/___)
Page 10 of 15                           Seller's Initials (___/___)

51

**"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

**BUYER'S INITIALS: ____/____     SELLER'S INITIALS ____**

17.    **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing. real property taxes and assessments shall be Paid current and *paid for by* Buyer        as of Close of Escrow. The property will be reassessed upon a change in ownership. Any supplemental tax bills shall be paid as follows: (i) for periods after Close of Escrow, by Buyer; and (ii) for periods prior to Close of Escrow, by *Buyer*. Tax bills issued after Close of Escrow shall be handled directly *by* Buyer;        Prorations shall be made based on a 30-day month.

18.    **WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding Law, if required.

19.    **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing party shall be entitled to reasonable attorney fees and costs from the non-prevailing party, except as provided in paragraph 16A.

20.    **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.

21.    **OTHER TERMS AND CONDITIONS:**
    A.    Road Share Agreement: Buyer shall execute the Private Road Improvement and Maintenance Agreement providing for the maintenance, repair and upgrade of the road serving the lots and adjacent properties within 17 days After Acceptance.
    B.    **Right of First Refusal Option:** Buyer shall grant Seller and the University of Spiritual Healing and Sufism a right of first refusal option to acquire the property at the price and upon such terms as Buyer is willing to sell the property to a third party. The right of first refusal option shall be evidenced by a separate option agreement document executed by the parties at close of escrow.

VACANT LAND PURCHASE AGREEMENT          Buyer' Initials (___/___)
Page 11 of 15                                   Seller's Initials (___/___)

52

C. _See attached Exhibit "A-1"._

22.   **DEFINITIONS:** As used in this Agreement:
A.     "Acceptance" means the time the offer or final counter offer is accepted in writing by a party and that acceptance is delivered to and personally received by the other party or that party's authorized agent in accordance with the terms of this offer or a final counter offer.
B.     "Agreement" means the terms and conditions of this accepted Vacant Land Purchase Agreement and any accepted counter offers and addenda.
C.     "Close of Escrow" means the date the grant deed, or other evidence of transfer of title, is recorded. If the scheduled close of escrow falls on a Saturday, Sunday or legal holiday, then close of escrow shall be the next business day after the scheduled close of escrow date.
D.     "Copy" means copy by any means including photocopy, NCR, facsimile and electronic.
E.     "Days" means calendar days, unless otherwise required by Law.
F.     "Days After" means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59 pm on the final day.
G.     "Days Prior" means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.
H.     "Electronic Copy" or "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either one to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other.
I.     "Law" means any Law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.
J.     "Notice to Buyer to Perform" means a document which shall be in writing and Signed by Seller and shall give Buyer at least 24 hours to remove a contingency or perform as applicable.
K.     "Repairs" means any repairs, alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.
L.     "Signed" means either a handwritten or electronic signature on an original document, Copy or any counterpart.
M.     Singular and Plural terms each include the other, when appropriate.

23.   **JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
A.     The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow

VACANT LAND PURCHASE AGREEMENT          Buyer' Initials ( ___ / ___ )
Page 12 of 15                                              Seller's Initials ( ___ / ___ )

53

Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: 1, 2, 4, 11, 12E, 17, 18, 20, 21, 22, and 23. The terms and conditions of the Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

     B.     A Copy of this Agreement shall be delivered to Escrow Holder within 3 business days After Acceptance. Buyer and Seller authorize Escrow Holder to accept and rely upon Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement.

     C.     A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within 2 business days after mutual execution of the amendment.

**24.**    **TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the above terms and conditions. All paragraphs with spaces for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not all parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of the offer. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

**25.**    **EXPIRATION OF OFFER.** This offer shall be deemed revoked and the deposit shall be returned, unless the offer is Signed by Seller, and a Copy of the Signed offer is personally received by Buyer, or by _____, who is authorized to receive it, by 5:00 pm on the third Day after this offer is signed by Buyer (or, if checked, ___ by _____ (date) at _____ am/pm.

Date:_____     Date: _____

BUYER _____     BUYER

_____

Print Name _____     Print Name

_____

VACANT LAND PURCHASE AGREEMENT     Buyer' Initials ( ___ / ___ )
Page 13 of 15     Seller's Initials ( ___ / ___ )

54

Address: _____   Address: _____

_____

_____   _____

**26.   ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement.
____ (if checked) SUBJECT TO ATTACHED COUNTER OFFER, DATED
_____.

Date: _____

SELLER  *Sewtosa Properties, LLC, a Washington limited liability company.*

By _____

Print Name _____

Title  *Manager* _____

Address _____

_____

(____/____)  **CONFIRMATION OF ACCEPTANCE:** A Copy of Signed Acceptance was personally received by Buyer on _____ (date) at _____ am/pm. **A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.**

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow holder acknowledges receipt of a Copy of this Agreement, (if checked ____ a deposit in the amount of $ _____), counter offer numbers _____, and agrees to act as Escrow Holder subject to paragraph 23 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____.

VACANT LAND PURCHASE AGREEMENT          Buyer' Initials (____/____)
Page 14 of 15                                        Seller's Initials (____/____)

55

Escrow Holder _____ Escrow # _____

By _____ Date _____

Address
_____

Phone/Fax/E-mail_____
Escrow Holder is licensed by the California Department of ___ Corporations, ___ Insurance, ___ Real Estate. License # _____

___/___ **REJECTION OF OFFER**: No counter offer is being made. This offer was reviewed and rejected by Seller on _____ (date).

VACANT LAND PURCHASE AGREEMENT           Buyer' Initials (___/___)
Page 15 of 15                            Seller's Initials (___/___)

56

EXHIBIT "A-1" TO VACANT LAND
PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

The following constitute additional terms and conditions to the sale of the Property:

1.  Closing of Escrow shall occur on the date that is the earlier of sixty (60) days following the date of the Agreement, or the sooner expiration of the Forbearance Period (as that term is defined under the Forbearance Agreement dated April 16, 2014 by and between Seller, Buyer, Wasco Investments, LLC, a California limited liability company, Parker Dam Development, LLC, a California limited liability company, BARUSA, LLC, a California limited liability company, William J. Barkett, and Lisa Barkett (the "Forbearance Agreement")).

2.  The Close of Escrow may be extended by Seller as reasonably necessary to achieve completion and recordation of the final Tentative Map as contemplated under the Forbearance Agreement.

3.  The sale of the Property be subject to perpetual easements in favor of the Wasco Property (defined under the Forbearance Agreement) owned and/or sold by Seller for vehicular and pedestrian roadway access as well as utilities and the right to connect thereto at no expense to Sentosa or its successors and assigns.  The obligations of Buyer hereunder surviving Close of Escrow with the easements to be recorded at Sentosa's request in form reasonably satisfactory to Sentosa.

4.  The obligations of Seller to perform under the Agreement are conditioned upon: (a) there having been no challenge or threat to: (i) Sentosa's foreclosure of the Wasco Property, (ii) the amounts due Sentosa under the Loans, or (iii) Sentosa's collateral positions on the Wasco Property, and (b) Sentosa's ability to convey clear title to the Wasco Property.

5.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto under the Forbearance Agreement.

[END OF EXHIBIT "A-1"]

_____          _____
Seller's Initials             Buyer's Initials

57

# EXHIBIT B



**James W. Fitch, Assessor – Recorder**
Kern County Official Records

ZARARTED
12/11/2014
9:58 AM

Recorded at the request of
**Public**

RECORDING REQUESTED BY
& WHEN RECORDED MAIL TO:

Gilmore, Wood, Vinnard,
& Magness
Post Office Box 28907
Fresno, CA  93729

DOC#:  **0214153536**

Stat Types: 1   Pages:   **8**

| | |
|---|---|
| Fees | 34.00 |
| Taxes | 0.00 |
| Others | 0.00 |
| PAID | $34.00 |

(SPACE ABOVE FOR RECORDER'S USE ONLY)

NOTICE OF LIS PENDENS

284-0\00172505.000

59

1  DAVID M. GILMORE, #105429
   dgilmore@gwvm.com
2  STEPHEN D. BLEA, #294339
   sblea@gwvm.com
3  GILMORE, WOOD, VINNARD & MAGNESS
   P.O. Box 28907
4  Fresno, CA  93729-8907
   Telephone: (559) 448-9800
5  Facsimile: (559) 448-9899

6  Attorneys for Plaintiffs William Barkett;
   Monterey Financial Advisors LLC; Parker
7  Dam Development; Wasco Investments LLC;
   and BARUSA LLC

8

9                    UNITED STATES DISTRICT COURT

10          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

11

12  WILLIAM BARKETT; MONTEREY          CASE NO. 1:14-CV-01698-LJO-JLT
    FINANCIAL ADVISORS LLC; PARKER
13  DAM DEVELOPMENT; WASCO             **NOTICE OF LIS PENDENS**
    INVESTMENTS LLC; BARUSA LLC,
14
                Plaintiffs,
15
        v.
16
    SENTOSA PROPERTIES LLC;
17  ARNOLD HUANG; ELIZABETH
    HUANG; EUGENE WONG; WF
18  CAPITAL, INC. and DOES 1 to 25, ,
19              Defendants.
20

21          NOTICE IS GIVEN that the above-captioned action was commenced on

22  August 20, 2014 in the Kern County Superior Court, by Plaintiffs William Barkett,

23  Monterey Financial Advisors LLC, Parker Dam Development, Wasco Investments LLC

24  and Barusa LLC and removed to the United States District Court, Eastern District of

25  California on October 29, 2014 by Defendants Sentosa Properties, LLC, Arnold Huang,

26  Elizabeth Huang, Eugene Wong, and WF Capital, Inc.; the action is now pending in the

27  above court.

28          The above-captioned action alleges a real property claim affecting certain

GILMORE, WOOD,
VINNARD & MAGNESS
A PROFESSIONAL CORPORATION
P.O. BOX 28907
FRESNO, CA 93729-8907

7828-54\00313900.000

60
1:14-CV-01698-LJO-JLT
NOTICE OF LIS PENDENS

1  real property that is situated in Kern County, California, and that is more particularly

2  described in Exhibit 1 attached hereto.

3  DATED: November 24 2014          GILMORE, WOOD, VINNARD & MAGNESS

4

5                                    By: _____

6                                         David M. Gilmore

7                                         Attorneys for Plaintiffs William Barkett;
                                          Monterey Financial Advisors LLC; Parker
8                                         Dam Development; Wasco Investments LLC;
                                          and BARUSA LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GILMORE, WOOD,
VINNARD & MAGNESS
A PROFESSIONAL CORPORATION
P.O. BOX 28907
FRESNO, CA 93729-8907

7828-54\00313900.000                        2                          1:14-CV-01698-LJO-JLT
                                                                       NOTICE OF LIS PENDENS

61

Order: Non-Order Search  Doc: KN:2014 00153536        Page 3 of 8        Created By: laura.marquez  Printed: 6/11/2015 12:50:59 PM PST

# EXHIBIT 1

62

T.S. No.: 13-00209-4
Loan No.: Barusa Loan/Wasco Investments LLC

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:  APN 487-010-69

PARCEL 2 OF LOT LINE ADJUSTMENT NO. 09-02 AS RECORDED NOVEMBER 2, 2009 AS DOCUMENT NO. 0209162732 OF OFFICIAL RECORDS, BEING THAT PORTION OF THE SW 1/4 OF SW 1/4, THE SE 1/4 OF THE SW 1/4 AND THE SW 1/4 OF THE SE 1/4 OF SECTION 2, TOWNSHIP 27 SOUTH, RANGE 24 EAST, M.D.M., IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, THE LEGAL OF WHICH IS HEREBY INCORPORATED BY REFERENCE HERETO AS THOUGH FULLY SET FORTH HEREIN.

EXCEPTING FROM THAT PORTION OF SAID LAND LYING WITHIN THE SW 1/4 OF THE SW 1/4 OF SAID SECTION 2, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND.

ALSO EXCEPTING FROM THAT PORTION OF SAID LAND LYING WITHIN THE  SE 1/4 OF THE SW 1/4 OF SAID SECTION 2, 1/2 OF ALL OIL, GAS AND OTHER MINERAL AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN AND UNDER SAID LANDS, AS RESERVED IN THE DEED EXECUTED BY SECURITY COMPANY AND RECORDED NOVEMBER 20, 1934 IN BOOK 544, PAGE 330 OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THAT PORTION OF SAID LAND LYING WITHIN THE SW 1/4 OF THE SE 1/4 OF SAID SECTION 2, ALL MINERAL RIGHTS ( INCLUDING OIL, GAS, OTHER HYDROCARBONS, ASSOCIATED SUBSTANCES, SULFER, NITROGEN, CARBON DIOXIDE, HELIUM AND OTHER COMMERCIALLY VALUBLE SUBSTANCES AS CONVEYED TO POND AVENUE PARTNERS, LLC IN QUITCLAIM DEED RECORDED APRIL 1, 2011 AS DOCUMENT NO. 0211042749 OF OFFICIAL RECORDS.

PARCEL 2:

AN EASEMENT IN AND TO THE HEREINAFTER DESCRIBED PROPERTY AND IN AND TO THE EXISTING (AND ANY REPLACEMENT) WELL, WATER PUMPING EQUIPMENT AND FACILITIES, AND PIPELINES LOCATED THEREON, SUCH EASEMENT IS FOR THE BENEFIT OF AND APPURTENANT TO PARCEL 1 HEREIN ABOVE DESCRIBED AND IS (A) FOR WELL SITE AND WATER PIPELINE PURPOSES AND (B) FOR PURPOSES OF EXTRACTING WATER FROM SAID WELL (AND ANY REPLACEMENT WELL) AND DELIVERING SUCH WATER TO SAID PARCEL 1 IN UNLIMITED QUANTITIES FOR IRRIGATION AND OTHER USES ON SAID PARCEL 1.  SUCH EASEMENT INCLUDES THE RIGHT TO ENTER UPON THE AREA OF SAID EASEMENT TO USE, OPERATE, REPAIR, REPLACE AND/OR MAINTAIN SAID WELL, WATER PUMPING EQUIPMENT AND FACILITIES, AND PIPELINES (INCLUDING ANY REPLACEMENTS THEREOF EXISTING THEREON FROM TIME TO TIME) FOR ALL  OF SUCH PURPOSES.  THE BURDEN AND BENEFIT OF SUCH EASEMENT SHALL RUN WITH THE LAND.  THE LOCATION AND AREA OF SUCH EASEMENT IS MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT PORTION OF PARCEL 1 OF PARCEL MAP 6156 IN THE CITY OF WASCO, COUNTY OF KERN, STATE OF CALIFORNIA, RECORDED DECEMBER 15, 1982 IN BOOK 27, PAGE 82 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF SAID PARCEL, FROM WHICH POINT THE NORTHEAST CORNER OF SAID PARCEL BEARS NORTH 1°10'36" EAST, 644.32 FEET; THENCE ALONG SAID EAST LINE, SOUTH 1°10'36" WEST, 75.88 FEET; THENCE NORTH 89°21'51" WEST, 528.27 FEET; THENCE SOUTH 00°38'09" WEST, 25.00 FEET; THENCE NORTH 89°21'51" WEST, 45.00 FEET; THENCE NORTH 00°38'09" EAST, 25.00 FEET; THENCE NORTH 89°21'51" WEST, 104.32 FEET TO THE WEST LINE OF SAID PARCEL; THENCE ALONG SAID WEST LINE, NORTH 1°10'09" EAST, 75.88 FEET; THENCE SOUTH 89°21'51" EAST, 676.06 FEET TO THE POINT OF BEGINNING.

63



PARCEL 3:  APN 487-290-18

PARCEL 2 OF LOT LINE ADJUSTMENT NO. 05-03, AS PER CERTIFICATE OF COMPLIANCE RECORDED JUNE 15 2005 AS INSTRUMENT NO 0205153764 OF OFFICIAL RECORDS, BEING  THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 27 SOUTH, RANGE 24 EAST, MOUNT DIABLO MERIDIAN, IN THE CITY OF WASCO, COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM THAT PORTION OF SAID LAND LYING WITHIN THE BOUNDARIES OF PARCEL MAP NO. 10669, AS PER MAP RECORDED MARCH 23, 2000 IN BOOK 51, PAGE 30 OF PARCEL MAPS.

ALSO EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED AUGUST 25, 1928 IN BOOK 262, PAGE 28 OF OFFICIAL RECORDS.

ALSO EXCEPTING 1/2 OF ALL OIL, GAS AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN AND UNDER SAID LANDS, AS RESERVED IN THE DEED EXECUTED BY SECURITY COMPANY AND RECORDED NOVEMBER 20, 1934 IN BOOK 544, PAGE 330 OF OFFICIAL RECORDS.

PARCEL 4:  APN'S:  487-290-05 AND 06

THE SE 1/4 OF THE SE 1/4 OF THE SE 1/4 OF SECTION 2, TOWNSHIP 27 SOUTH, RANGE 24 EAST, M.D.M., IN THE CITY OF WASCO, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ANY PORTION LYING WITH PARCEL 1  OF PARCEL MAP 9161 FILED DECEMBER 6, 1989 IN BOOK 39, PAGE 114 AND 115 OF PARCEL MAPS.

ALSO EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL MAP 10498 FILED JULY 10, 1998 IN BOOK 49, PAGES 167 AND 168 OF PARCEL MAPS.

ALSO EXCEPTING THEREFROM THAT PORTION OF SAID LAND LYING WITH THE BOUNDARIES OF PARCEL MAP NO. 10669, AS PER MAP RECORDED MARCH 23, 2000 IN BOOK 51, PAGE 30 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF KERN COUNTY.

ALSO EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA, BY DEED DATED JULY 31, 1928 AND RECORDED AUGUST 25, 1928 IN BOOK 262, PAGE 28 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM THE ABOVE DESCRIBED LAND, 1/2 OF ALL OIL, GAS AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN AND UNDER SAID LANDS, AS RESERVED IN THE DEED EXECUTED BY SECURITY COMPANY AND RECORDED NOVEMBER 20, 1934 IN BOOK 544, PAGE 330 OF OFFICIAL RECORDS.

PARCEL 5:  APN'S:  487-290-14, 15 AND 16

PARCELS 2, 3 AND 4 OF PARCEL MAP 10669, IN THE CITY OF WASCO, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED MARCH 23, 2000 IN BOOK 51, PAGE 30 OF MAPS, AND BY CERTIFICATE OF CORRECTION RECORDED NOVEMBER 9, 2005 AS INSTRUMENT NO. 0205312369 OF OFFICIAL RECORDS,  IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE ABOVE DESCRIBED LAND, 1/2 OF ALL OIL, GAS AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN AND UNDER SAID LANDS, AS RESERVED IN THE DEED EXECUTED BY SECURITY COMPANY AND RECORDED NOVEMBER 20, 1934 IN BOOK 544, PAGE 330 OF OFFICIAL RECORDS.

THE FOLLOWING PARCEL WAS ORIGINALLY INCLUDED IN THE DEED OF TRUST COVERED HEREIN BUT HAS BEEN PARTIALLY RECONVEYED BY DOCUMENT RECORDED NOVEMBER 2, 2009 AS DOCUMENT NO. 0209162754 OF OFFICIAL RECORDS AND IS MORE PARTICULARLY DESCRIBED AS FOLLOWS:

64

PARCEL 6:

PARCEL 1 OF LOT LINE ADJUSTMENT NO. 09-02 AS RECORDED NOVEMBER 2, 2009 AS DOCUMENT NO. 0209162732 OF OFFICIAL RECORDS, BEING THAT PORTION OF THE SW 1/4 OF SW 1/4, THE SE 1/4 OF THE SW 1/4 AND THE SW 1/4 OF THE SE 1/4 OF SECTION 2, TOWNSHIP 27 SOUTH, RANGE 24 EAST, M.D.M., IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, THE LEGAL OF WHICH IS HEREBY INCORPORATED BY REFERENCE HERETO AS THOUGH FULLY SET FORTH HEREIN.

EXCEPTING FROM THAT PORTION OF SAID LAND LYING WITHIN THE SW 1/4 OF THE SW 1/4 OF SAID SECTION 2, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND.

ALSO EXCEPTING FROM THAT PORTION OF SAID LAND LYING WITHIN THE  SE 1/4 OF THE SW 1/4 OF SAID SECTION 2, 1/2 OF ALL OIL, GAS AND OTHER MINERAL AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN AND UNDER SAID LANDS, AS RESERVED IN THE DEED EXECUTED BY SECURITY COMPANY AND RECORDED NOVEMBER 20, 1934 IN BOOK 544, PAGE 330 OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THAT PORTION OF SAID LAND LYING WITHIN THE SW 1/4 OF THE SE 1/4 OF SAID SECTION 2, ALL MINERAL RIGHTS ( INCLUDING OIL, GAS, OTHER HYDROCARBONS, ASSOCIATED SUBSTANCES, SULFER, NITROGEN, CARBON DIOXIDE, HELIUM AND OTHER COMMERCIALLY VALUBLE SUBSTANCES AS CONVEYED TO POND AVENUE PARTNERS, LLC IN QUITCLAIM DEED RECORDED APRIL 1, 2011 AS DOCUMENT NO. 0211042749 OF OFFICIAL RECORDS.

APN: 487-010-69, 487-290-05, 06, 14, 15, 16 AND 18

65

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF FRESNO**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Fresno, State of California. My business address is Post Office Box 28907, Fresno, California 93729-8907.

On November 26, 2014, I served true copies of the following document(s) described as **NOTICE OF LIS PENDENS** on the interested parties in this action as follows:

Elizabeth A. Sperling
Alston & Bird LLP
333 South Hope Street
Sixteenth Floor
Los Angeles, CA 90071
Attorneys for: Sentosa Properties LLC
and specially appearing for Arnold
Huang, Elizabeth Huang, Eugene Wong
Telephone: (213) 576-1000
Facsimile: (213) 576-1100
Email: elizabeth.sperline@alston.com

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Gilmore, Wood, Vinnard & Magness's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 26, 2014, at Fresno, California.

Lisa Renwick